[No. D013973. Fourth Dist., Div. One. June 25, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
HERMAN CEGERS, Defendant and Appellant.

## COUNSEL

Joan Isserlis, under apointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Harley D. Mayfield, Assistant Attorney General, Rudolf Corona, Jr., and Frederick R. Millar, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FROEHLICH, J.**—Herman Cegers (Cegers) was convicted by a jury of assault with a deadly weapon, use of a dangerous and deadly weapon, and intentional infliction of great bodily injury. The court found mitigating

circumstances, and utilized concurrent term sentences and stays of the enhancements to impose a lower term sentence of only two years in state prison. Cegers's principal contention on appeal is that the court committed prejudicial error in excluding certain expert testimony from a psychologist relative to sleep disorders alleged to have influenced Cegers's behavior. We conclude the court improperly applied the *Kelly-Frye* test (*People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240]; *Frye* v. *United States* (1923) 54 App.D.C. 46 [293 F. 1013, 34 A.L.R. 145]) to evidence which was essentially only ordinary expert testimony and that the exclusion of such evidence was prejudicial. We therefore reverse.

## FACTS

Cegers and his girlfriend, Willie, lived in an apartment in San Diego. Cegers had been separated from his son, Charles, for many years. When he learned of the adult son's financial difficulties, he invited the son, the son's wife, Naomi, and their child, Charlie, to come to San Diego and live with Cegers and Willie. When the young people moved in, Cegers and Willie gave them their bedroom and moved their mattress to the living room.

This arrangement proved ill-advised. Naomi was accused of being a sloppy housekeeper; Cegers and his son argued about money; everyone apparently drank to excess and became combative when drunk. Within two weeks of their arrival, Cegers asked Charles and Naomi to move out. They did not immediately honor this request, and it was repeated several times. Cegers threatened Charles with violence if he should not move, and they had several combative verbal confrontations but no actual physical combat.

On the evening of the assault Cegers and Charles took a walk together and shared a large bottle of beer. Thereafter, in response to Cegers's urgings, Charles, Naomi and little Charlie left the Cegers's residence (without, however, taking their belongings) and went to the home of Cegers's sister, Diane. At Diane's house the relatives proceeded to drink beer and discuss the family problems. They tried to call the Cegers's residence two or three times between 11:30 p.m. and 2 a.m. The phone was picked up but then replaced with no vocal response (indicating someone was at home).

Cegers's relatives became agitated about the situation. Included in their drunken discussion was the accusation that Cegers had wrongfully taken some $5.50 that Aunt Diane had given to little Charlie. The group then decided to go over to Cegers's house. They arrived in the early morning during darkness, around 4 or 5 o'clock. Willie responded vocally to their knock but did not open the door. Charles then boosted Diane through a

window, Diane opened the front door, and Charles, Diane and Naomi entered the front room.

Cegers and Willie had been sleeping on their mattress in the front room. When the group entered, Willie got up and talked to them, the subject apparently being the baby's money and what was to be done about it. Although the testimony was not entirely consistent, it seems the living room was at best dimly lit from lights either on the patio or in the adjacent kitchen. During this period Cegers remained in bed with his eyes closed. It was later determined he had a blood-alcohol content of .188.

Cegers was then awakened by nudging from Diane. He rose suddenly, put on his trousers, went to the adjacent kitchen where he grasped a knife in each hand, and came back into the living room waving the knives and uttering such exclamations as "get out of my fucking house." The three intruders fell over each other trying to get out of the house. They were unsuccessful, however, in avoiding Cegers's flailing assault. Cegers "popped" Diane in the eye with his fist, knocking her down. She arose, only to be cut in the shoulder by one of his knives, the other inflicting a serious wound to Charles's back. The three intruders finally achieved an exit and were not followed by Cegers.

Paramedics were called, and then the police. When the police arrived they found Cegers sitting on his living room couch. In response to questioning he directed the officers to the kitchen where the two knives were found.

Cegers and Willie testified for the defense. After the stabbings occurred Diane reentered the house and was assisted by Willie in finding the bathroom. Cegers testified that "all of a sudden I come [sic] to myself" and said "Oh, my God, I'm going to jail." Cegers's testimony as to the stabbing varied slightly from that of the intruders. In his version the knives were under his pillow; he was already partially clothed; when abruptly awakened he saw "shadows," did not know who the intruders were, thought he might be under attack, grabbed the knives from under the pillow and acted in self-protection. He stated he loved his son, had no ill will toward Diane, and had never intended to injure them. The general import of his testimony suggested a defective appreciation of events at the time they happened as well as an impaired recollection.

## THE EXPERT TESTIMONY

The defense retained the services of Dr. Merrill M. Mitler, a psychologist and expert in sleep disorders. There was never a question as to the qualifications of Dr. Mitler in his field of sleep disorders. He had specialized in the

field for 15 years, was a member of the American Sleep Disorders Association, had previously testified as an expert in sleep disorders, had published scientific treatises on the subject, and in conjunction with neurologists at Scripps Clinic had treated patients with sleep disorders. Dr. Mitler at the time was director of research of the sleep disorder center at Scripps Clinic and Research Foundation.

Dr. Mitler had examined Cegers and caused him to be examined by Dr. Poceta, a neurologist. Poceta had performed an EEG on Cegers, the results of which were considered by Mitler in his diagnosis. Mitler took a history from Cegers. He also administered an all-night test of oxygen in Cegers's blood by use of an instrument called an "oximeter." This was done when Cegers was in jail and at a time when he had no alcohol in his system. The purpose of the test is to measure the "oxygen saturation" in the blood during sleep. If sleep disorders occur which alter breathing habits the oxygen level will be decreased, resulting in detrimental consequences in terms of brain and cardiovascular functions. The oximeter is a device used for various medical diagnostic purposes and is well accepted in the medical community. No challenge was made to Dr. Mitler's testimony based upon any suggestion of unreliability in the testing of Cegers's blood oxygen content.

Dr. Mitler was prepared to testify that Cegers suffered from apnea, and that on the day of the assault he also suffered from "confusional arousal syndrome." The oximeter showed that at times during Cegers's sleep his oxygen level diminished, caused by some defect in breathing patterns. This condition, called "sleep apnea," causes confusion and abnormal behavior upon being awakened, such as sleepwalking. The condition is exacerbated by excess alcohol consumption. Sleep apnea is a well-recognized condition, being listed in manuals which categorize diseases such as the International Classification of Diseases (ICD-9) and the psychiatrists' more specialized diagnostic manual (DSM-III-R). After extensive voir dire out of the presence of the jury, the doctor's testimony about Cegers's sleep apnea, as well as its potential impact on his conduct when suddenly awakened, was found admissible and presented to the jury.

The excluded portion of Dr. Mitler's testimony was that which would have explored the syndrome called "confusional arousal syndrome." The syndrome is associated with people who have sleep apnea and are awakened during a period of depressed mental functioning. They are able to perform motor functions, such as walking, while still mentally asleep. In severe cases such persons can be violent, causing injury or death to others, in which event their condition has been termed "homicidal somnambulism." The condition is properly termed physiological rather than psychological, because it results from an anomaly of the brain.

Dr. Mitler was prepared to testify that Cegers suffered from confusional arousal syndrome on the night of the assault. His opinion was based upon the oximeter test he had administered, Cegers's history (which included recitation of sleepwalking and sleep disorders), the evidence of excessive alcohol use on the night in question, and the bizarre nature of the assault itself. Mitler's diagnosis also relied upon Dr. Poceta's EEG test, which revealed no brain tumors or other readily discernible brain abnormalities. In that Cegers was charged with first degree attempted murder, this testimony was clearly relevant, if admissible, in terms of Cegers's state of mind at the time of the assault.

### TRIAL COURT'S EVIDENTIARY RULING

The trial court held an extensive hearing outside the presence of the jury to determine whether to admit Dr. Mitler's testimony as it pertained to confusional arousal syndrome. The court's ultimate ruling was based upon the testimony of Dr. Mitler augmented by the court's review of the psychiatric disease manual. The court was impressed with the fact that the syndrome was not identified as such in any diagnostic manual, and further that those experts who did recognize the syndrome had not reached complete agreement on the name to give it—calling it, in addition to "confusional arousal syndrome," "nocturnal confusional arousal," "episodic nocturnal dangerousness," and "homicidal somnambulism." The entire field of sleep disorders only in recent times had emerged as a specialty, and was still establishing its guidelines for practice and research.

The court concluded that the strictures of *Kelly-Frye* should be utilized in determining the admissibility of testimony concerning the syndrome and also the related question whether the evidence should be excluded on the basis of Evidence Code section 352. The court concluded that it was "dealing with a new and emerging scientific theory or method of diagnosis and not mere expert testimony . . . ." It found the analysis of the confusional arousal syndrome to be a scientific theory similar to the rape reaction syndrome, or the child molest syndrome, and hence subject to restrictions in use in a jury trial, citing *In re Sara M.* (1987) 194 Cal.App.3d 585 [239 Cal.Rptr. 605] and *People* v. *Bledsoe* (1984) 36 Cal.3d 236 [203 Cal.Rptr. 450, 681 P.2d 291].

After reviewing and analyzing the *Kelly-Frye* rule and finding it applicable to this case, the court concluded: "To sum up, I find that the evidence of the syndrome is inadmissible due to lack of foundational proof that the syndrome or syndromes have been generally accepted by the scientific psychological/psychiatric community."

Reviewing the matter in terms of Evidence Code section 352, the court again referred to the emerging nature of the syndrome, and concluded that

while its use might be beneficial for purposes of treatment or therapy, it should not be permitted in a courtroom where the fact in issue is criminal responsibility. "To permit the witness to testify to a relatively new emerging and relatively untested syndrome under these circumstances would give undue credence to something far beyond the testimony of a simple expert witness expressing that witness's opinion."

We believe the trial judge's analysis, while most thoughtful, careful and indeed analytical, was in error. In our view *Kelly-Frye* does not apply to this case, and it was an abuse of discretion in terms of utilization of Evidence Code section 352 to exclude the evidence of the syndrome.

### DISCUSSION

"*Kelly-Frye*" is the name given to a specific limitation upon the use of expert scientific testimony and evidence. The principle was first definitively set forth in *Frye* v. *United States, supra*, 293 F. 1013, 1014, and later adopted by the California Supreme Court in *People* v. *Kelly, supra*, 17 Cal.3d 24. The objective of the *Kelly-Frye* rule is to preclude the use of untested and developing scientific methods of fact determination. The proof of a fact in issue is not permitted by use of new or novel methods until it can be shown that the new procedure has achieved reliability. This determination is made not upon the basis of the trial judge's determination of scientific reliability, but upon the judge's discovery as to whether there is "substantial agreement and consensus in the scientific community" regarding the process's reliability. (*People* v. *Kelly, supra*, 17 Cal.3d at p. 31.)

As summarized in 2 Witkin, California Evidence (3d ed. 1986) Demonstrative, Experimental and Scientific Evidence, section 864, page 831, admissibility of testimony based upon a new scientific test or procedure depends upon satisfaction of a three-pronged test: (1) the new scientific method must be shown to be reliable; (2) the witness utilizing the new procedure must be qualified as an expert in the field; and (3) it must be shown that correct scientific procedures were utilized in the application of the new procedure.

A review of the many cases construing the *Kelly-Frye* principle indicates that they fall mainly into two categories: (1) new techniques for developing and measuring physical evidence, and (2) the use of psychological evidence to establish a pattern of conduct or symptoms from which a conclusion as to an individual's behavioral disposition may be extracted.

What we might call the "traditional" use of *Kelly-Frye* is its limitation upon the use of experimental or unproved scientific "tests" for the determination of facts. *Frye* involved the exclusion of what appears to be an early

form of lie detector test. *Kelly* dealt with the use of "voiceprint" evidence to identify the perpetrator of a crime. Other cases have measured the scientific community's acceptance of such procedures as proof of paternity through blood tests, tests for alcohol intoxication, etc. (See tabulation of cases and examples in 2 Witkin, *supra*, § 862, at pp. 828, 829.)

A most recent evolution of *Kelly-Frye* application to a new procedure is found in the attempted use of the genetic analysis of dried blood and semen stains (called "electrophoretic stain-test") to identify the perpetrator of a crime. In *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], the court reviewed scientific reports which conflicted in their assessment of the procedure's reliability. It had no qualified expert witness before it to resolve reliability questions, and concluded it was unclear whether "impartial science has developed a *consensus* on the crucial issue" of reliability of the test. (*Id.* at p. 534.) Later cases presented appellate review which permitted a determination of scientific reliability and acceptability. (See *People* v. *Reilly* (1987) 196 Cal.App.3d 1127 [242 Cal.Rptr. 496]; *People* v. *Morris* (1988) 199 Cal.App.3d 377 [245 Cal.Rptr. 52]; *People* v. *Smith* (1989) 215 Cal.App.3d 19 [263 Cal.Rptr. 678].) A process found unproved and inadmissible in 1985 was by 1989 so well established in the scientific community, and so often accepted by trial and appellate courts, as to end the necessity of a case-by-case adjudication. (*People* v. *Smith, supra,* at p. 26; see also *People* v. *Axell* (1991) 235 Cal.App.3d 836 [1 Cal.Rptr.2d 411], which applied the *Kelly-Frye* analysis to the use of deoxyribonucleic acid (DNA) for genetic identification of human matter.)

The second branch of the *Kelly-Frye* rule—that which pertains to psychological evidence—does not involve mechanical, scientific or chemical testing, but rather concerns the use of psychological screening and diagnosis for the purpose of establishing some fact in issue. Illustrative is the use of a psychological "profile" for the demonstration of typical attributes of a particular class of victims or perpetrators. Rape victims, child molest victims and sexual perverts, for instance, are asserted by some psychologists to have common characteristics. These characteristics are then stereotyped into a description called a "profile," and the fact that the victim or the defendant in the case fits the profile is sought to be used for various purposes.

The Supreme Court dealt definitively with the question of the proper use of such evidence in *People* v. *Bledsoe, supra,* 36 Cal.3d at page 251. Finding that the rape trauma syndrome was a development by psychologists for use in therapy, and not for the purpose of identifying criminal conduct, the court found it inadmissible for the purpose of establishing the commission of a rape. The court suggested, however, that the profile evidence could have

been used for other purposes, such as disabusing the jury of common myths held about rape and rape victims. (*Id.* at p. 247.) Use of such psychological syndromes or profiles has been confirmed in subsequent cases, not for the purpose of establishing commission of a crime, but only for peripheral evidentiary purposes. (See *People* v. *Bowker* (1988) 203 Cal.App.3d 385 [249 Cal.Rptr. 886]; *People* v. *Bergschneider* (1989) 211 Cal.App.3d 144 [259 Cal.Rptr. 219]; *People* v. *Stark* (1989) 213 Cal.App.3d 107 [261 Cal.Rptr. 479].)

Expansion of *Kelly-Frye* to apply to psychological testimony has, however, met with considerable theoretical difficulties. In *People* v. *McDonald* (1984) 37 Cal.3d 351 [208 Cal.Rptr. 236, 690 P.2d 709, 46 A.L.R.4th 1011], the question was whether an expert should be permitted to advise the jury concerning the psychological factors which affect accuracy in eyewitness identification. The court held that *Kelly-Frye* had no application, since the information to be provided was not "scientific evidence" but rather simply "expert testimony." "It is important to distinguish . . . between expert testimony and scientific evidence. When a witness gives his personal opinion on the stand—even if he qualifies as an expert—the jurors may temper their acceptance of his testimony with a healthy skepticism born of their knowledge that all human beings are fallible. But the opposite may be true when the evidence is produced by a machine: like many lay persons, jurors tend to ascribe an inordinately high degree of certainty to proof derived from an apparently 'scientific' mechanism, instrument, or procedure. . . . [¶] We have never applied the *Kelly-Frye* rule to expert medical testimony, even when the witness is a psychiatrist and the subject matter is . . . esoteric . . . ." (*Id.* at pp. 372, 373.)

A somewhat earlier Court of Appeal decision reflects similar thinking. In *People* v. *Phillips* (1981) 122 Cal.App.3d 69 [175 Cal.Rptr. 703], the defendant was accused of poisoning her children. In order to explain the apparent inconsistency between the mother's attentive attitude toward her children and the thought that she would poison them, an expert explained to the jury the symptoms of "Munchausen's syndrome by proxy." This is a condition motivating a parent to cause illness in her child in order to attract attention or sympathy. The court had no difficulty approving the admission of this evidence, stating it was not a new scientific development, as per *Kelly-Frye*, and it made no difference that the syndrome might be "an 'unrecognized illness . . . not generally accepted by the medical profession,'" or that it was not listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. (*Id.* at p. 86.)

Also interesting are the cases in which the *Kelly-Frye* test has been held inapplicable to medical diagnoses based on actual examination and testing of

the subject. It is not necessary to establish that every device used by a doctor fits the *Kelly-Frye* test (a colposcope, for instance, in *People* v. *Luna* (1988) 204 Cal.App.3d 726 [250 Cal.Rptr. 878]). An expert may always give his opinion as to the cause of a particular injury or condition, and lack of absolute scientific certainty does not constitute a basis for excluding the opinion. "[A] medical diagnosis based on medical literature will not be viewed as a new scientific technique, but simply the development of an opinion from studies of certain types of cases." (*People* v. *Mendibles* (1988) 199 Cal.App.3d 1277, 1293-1294 [245 Cal.Rptr. 553].)

Similar results are achieved in the cases permitting diagnosis of the cause of injuries to a small child based upon the physician's examination of the injuries. "An expert medical witness may give his opinion as to the means used to inflict a particular injury, based on his deduction from the appearance of the injury itself. [Citation.] A medical diagnosis based on probability—as is the case with the 'battered child syndrome' diagnosis—is admissible; the lack of scientific certainty does not deprive the medical opinion of its evidentiary value." (*People* v. *Jackson* (1971) 18 Cal.App.3d 504, 507 [95 Cal.Rptr. 919].)

Perhaps the most instructive case in the field is *People* v. *Stoll* (1989) 49 Cal.3d 1136 [265 Cal.Rptr. 111, 783 P.2d 698], which involved admission of expert psychological testimony in a child abuse case. The defendants were accused of committing various sex acts on children. The psychologist had administered psychological tests to the defendants, and was prepared to testify that the defendants did not possess "any 'pathology' in the nature of 'sexual deviation'" (*id.* at p. 1146), and that as a result it was unlikely they had participated in the events forming the criminal charge (*id.* at p. 1149). In ruling on the admissibility of this testimony the court reviewed the two paths of precedent based upon *Kelly-Frye.*

The principal application of the *Kelly-Frye* rule was identified as applicable "only . . . to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science, and even more so, the law. The courts are willing to forgo admission of such techniques completely until reasonably certain that the pertinent scientific community no longer views them as experimental or of dubious validity." (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1156.) A "theme" in this line of cases is that "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible." (*Ibid.*)

While the *Kelly-Frye* principle is not limited, the court said, to "physical evidence" (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1156, citing *People* v. *Shirley* (1982) 31 Cal.3d 18 [181 Cal.Rptr. 243, 723 P.2d 1354] involving exclusion of hypnotically refreshed testimony), it is generally not available to limit expert medical testimony. The expert's opinion as to the state of mind or predilections of a defendant is admissible, "absent some special feature which effectively blindsides the jury." (*People* v. *Stoll, supra,* at p. 1157.)

The *Stoll* court also reviewed the second series of cases which invoke *Kelly-Frye*—those utilizing a psychological or motivational "profile" to predict tendencies of a victim or accused—focusing on its own authority in *People* v. *Bledsoe, supra,* 36 Cal.3d 236. The *Stoll* court concluded that *Bledsoe* had not really blessed the use of *Kelly-Frye* in such cases: "*Bledsoe* did not hold that the *Kelly-Frye* test applied to the expert opinion in that case, nor did we discuss the test's relationship to 'syndrome' or other expert psychological evidence in general." (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1161.) Such evidence, as in the child abuse or rape victim syndrome cases, is precluded from use to show perpetration of the crime not because of any deficit in terms of the *Kelly-Frye* test, but simply because it is irrelevant. Such "syndrome" evidence is used by science to identify, predict and treat a victim's emotional problems; it is not designed nor is it relevant for the purpose of measuring guilt of a third party or determining the legal culpability of the third party's actions. (*Id.* at pp. 1161, 1162.)

█ With this background of authority, then, we return to the court's ruling in this case. We focus first upon the possibility that Dr. Mitler's testimony failed in terms of the first (may we say the traditional) application of *Kelly-Frye*: its use for testing admissibility of new scientific tests or procedures. The testimony should not have been excluded on the basis of this measure of *Kelly-Frye*. The only scientific test utilized by Dr. Mitler (other than the neurologist's EEG examination, which is not in question here) was the administration of the oximeter test. The oximeter, however, is not a new scientific gadget the reliability of which is questionable. It has been used for many medical purposes other than monitoring blood oxygen content during sleep.

The trial court excluded the testimony not because of the expert's use of new and untried procedures, but because the name given by the expert to the subject's condition and his diagnosis of the condition were relatively new to medical science. This was not a case in which a magical device was unveiled to astound a gullible jury. It was, as in *Stoll* and *McDonald*, simply the testimony of an expert who had examined a subject and whose diagnosis might have been helpful in determining the mental state of the subject.

Mitler's analysis of Cegers's sleep disorders represented stock medical testimony, subject on cross-examination to probing and on rebuttal to opposition expert evidence. That the name given to the malady had not yet achieved complete consensus in the psychological community cannot be a basis for preclusion of the evidence. (See *People* v. *McDonald, supra,* 37 Cal.3d at p. 373.)

The exclusion of Mitler's testimony also cannot be based on the second line of *Kelly-Frye* cases (even assuming, as questioned in *People* v. *Stoll,* that these "profile" cases are subject to *Kelly-Frye* analysis). (*People* v. *Stoll, supra,* 49 Cal.3d at p. 1161.) The doctor was not engaged in assembling a set of behavioral characteristics for the purpose of showing that Cegers's unusual conduct could in some way be explained. Rather, the doctor's approach was specific to Cegers, based upon a personal examination, the taking of a history, the measuring of blood levels during sleep, and a consideration of the unique facts of the assault. It was, in fact, garden variety medical/psychological testimony concerning the probable physiological defect to which Cegers was subject, a defect that would affect his mental state at the time of the assault.

We therefore conclude that there was no basis for exclusion of Dr. Mitler's testimony concerning the confusional arousal syndrome, based upon the *Kelly-Frye* approach.

■ The trial court cited Evidence Code section 352 as an alternative ground for excluding Dr. Mitler's testimony. Evidence Code section 352 permits discretionary exclusion of evidence if "its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." The trial judge did not cite lack of probative value of the tendered evidence, nor was it suggested that this part of Dr. Mitler's testimony would necessitate an undue consumption of time or create substantial danger of undue prejudice. The court based its utilization of section 352 on its belief that the evidence presented "substantial danger of misleading the jury and confusing the issues. To permit the witness to testify to a relatively new emerging and relatively untested syndrome under these circumstances would give undue credence to something far beyond the testimony of a simple expert witness expressing that witness's opinion. . . ."

The exclusion of evidence on the authority of Evidence Code section 352 by definition is a *discretionary* call on the part of the trial judge. The exercise of such discretion should be reversible on appeal only when it is manifestly

abused. (*Wanland* v. *Los Gatos Lodge, Inc.* (1991) 230 Cal.App.3d 1507, 1523 [281 Cal.Rptr. 890].) The ruling in this case, however, is not illustrative of the typical exercise of discretion under section 352. Such exclusion typically involves evidence which is repetitious of other evidence previously introduced, involves collateral matters of questionable relevance, or would require a great amount of time. (See 1 Witkin, Cal. Evidence (3d ed. 1986) Circumstantial Evidence, §§ 304-306, pp. 274-277.) In such situation the trial court serves as something of a referee, monitoring the progress of the case and precluding wasteful consumption of time, or excluding evidence of questionable pertinence to the issues of the case tending improperly to influence the jury.

The evidence in question here was central to the defendant's case. It was not cumulative of other evidence nor could it have been prejudicial in the usual sense. The judge's reason for exclusion paralleled his analysis of the *Kelly-Frye* rule—that the evidence involved a new and untried scientific procedure which would be unduly persuasive to the jury. We believe the judge was simply wrong in this approach. As we have noted above, Mitler's testimony did not rely on questionable medical techniques, nor did it attempt to fit the defendant within a psychological "profile" for the purpose of arguing that he would have acted in accordance with the profile. Rather, this was expert testimony concerning a physiological defect which the jury could well have concluded affected the defendant's mental abilities at the time of the assault. Having decided that the principles of *Kelly-Frye* do not apply to exclude this evidence, we are bound to conclude that the parallel concepts embraced in Evidence Code section 352 similarly cannot suffice to permit exclusion.

██ We believe the case is controlled by *People* v. *McDonald, supra,* 37 Cal.3d at pages 372, 373. Dr. Mitler, a qualified expert, testified as to his expert opinion concerning the mental characteristics of the defendant. Although the testimony was susceptible of probing on cross-examination, and possibly of rebuttal by opposing expert testimony, it was in our opinion clearly admissible. Considering the bizarre circumstances of the crime, it is at least reasonably probable that had the evidence in question been admitted the defendant would not have been found guilty. Its exclusion was therefore prejudicial and requires reversal. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

In that we find reversal is required because of the erroneous evidentiary ruling, we do not discuss the other contentions on appeal—alleged instructional and sentencing error.

## DISPOSITION

The judgment is reversed.

Work, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied July 20, 1992, and respondent's petition for review by the Supreme Court was denied October 1, 1992. Mosk, J., was of the opinion that the petition should be granted.