Filed 9/22/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DYLAN W. CHAVEZ,<br><br>    Defendant and Appellant. | 2d Crim. No. B307951<br>(Super. Ct. No. PA093925)<br>(Los Angeles County) |

        Appellant Dylan W. Chavez challenges the sufficiency of the evidence supporting his conviction for leaving the scene of an accident resulting in permanent, serious injury to another person (Veh. Code,[1] § 20001, subds. (a), (b)(2)).  At the time of trial nine months after the accident, the injured victim had already undergone two surgeries to repair broken bones in his left leg, the bones had not healed, and he still had an open wound.  The

---

      [1] All undesignated statutory references are to section 20001 of the Vehicle Code.  After the jury convicted appellant of violating section 20001, he admitted a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)) and was sentenced to six years in state prison.

victim testified that he found it difficult to walk, balance, and sleep as a result of his injuries and that he had been unable to return to work. The victim's treating surgeon opined it was "likely" the victim's leg would never be as good as it was prior to the accident, would "probably not" ever be as good as his other leg, and that the victim would "never be in as good of shape as he was prior to the accident."

Appellant contends the evidence is insufficient to support the jury's finding that the victim had suffered a permanent, serious injury, i.e., "the loss or permanent impairment of function of a bodily member or organ." (§ 20001, subd. (d).) In making this claim, appellant also asserts that the medical expert's opinions on this issue were based on conjecture and speculation. We reject both contentions and accordingly affirm.

## STATEMENT OF FACTS

### *The Accident And Its Immediate Aftermath*

On December 13, 2019, Juan Torres, Jr. (Torres) was living with his parents Juan Torres, Sr. (Juan) and Elsa Torres (Elsa), and his brothers Angel and Daniel. Torres got up early that morning and put on his uniform for his construction job, which consisted of jeans, a neon yellow shirt, a bright orange sweatshirt, and multicolored vest with reflective stripes.

At approximately 5:45 a.m., Torres went outside to look at a flat tire on Daniel's car, which was parked across the street from their house. Elsa followed Torres outside and stood in the driveway. As Torres was crouched down to inspect the flat tire, Elsa saw the headlights from a red Hyundai approaching at a high rate of speed and yelled at Torres to "[w]atch out." Torres heard Elsa yell but did not have time to react. The Hyundai hit Torres, causing him to fly in the air and land on the ground

2

under the back of Daniel's car. Appellant, who was driving the Hyundai, did not stop or slow down. He continued driving and turned onto a nearby dead-end street.

Juan heard Elsa scream and ran outside. She told him what had happened and urged him to block the dead-end street with his truck so that appellant could not drive away. Juan drove his truck onto the dead-end street and saw the Hyundai, which was parked near the end of the street. Juan parked his truck in the street to prevent appellant from driving away. Appellant got out of the Hyundai and Juan approached him and asked him what had happened. Appellant ignored Juan as he inspected the damage to the front left side of his vehicle, then said he had not seen or felt anything that would have led him to believe he had hit someone. Appellant attempted to get back into his vehicle, but Juan wrested his keys from him so he could not drive away.

Angel and several neighbors arrived and accompanied Juan as he walked appellant back to the scene of the accident. Appellant told Torres "I didn't see you" and asked "[w]here were you?" Paramedics arrived and took Torres to the hospital. When the police arrived, appellant said "I didn't do anything, bro. That guy was jaywalking . . . . I didn't do nothin."

### Torres's Testimony Regarding His Injuries

Torres testified regarding the injuries he suffered as a result of the accident, which occurred nine months prior to trial. Approximately 12 hours after Torres arrived at the hospital, he underwent surgery on his left tibia and fibula. Another surgery was conducted approximately six months later, i.e., three months prior to trial. During the first surgery, a metal plate and screws were placed in his leg.

3

Torres, who was 26 years old at the time of trial, showed his injuries to the jury and noted that he still had an open wound. For the first few months after the accident, his pain level was 10 on a scale of 1 to 10. At the time of trial, his pain level by the end of each day was always 4 or 5. In the months following the accident he underwent painful physical therapy to regain his ability to walk, stand, sit, and climb stairs. He still needed physical therapy, but had to stop after three months due to the COVID-19 pandemic. As a result of his injuries it was difficult to walk, sit, and sleep and he could no longer run. He also had balance problems and had been unable to return to his construction job.

### Dr. Tilan's Expert Testimony

Dr. Justin Tilan, Torres's treating orthopedic surgeon, offered expert testimony regarding Torres's injuries. After testifying to his professional background and training and experience, Dr. Tilan indicated that he was still treating Torres for a "left open tibia fracture, delayed union or nonunion." The doctor explained that Torres had "suffered an injury sufficient enough such that the broken bones poke outside of his body," and that the injury had "fail[ed] to heal in a sufficient amount of time."

When asked what would be considered a sufficient amount of time for the injury to heal, Dr. Tilan replied that "for an injury like that . . . ideally it's not so much time, but his x-rays and clinical follow-up should demonstrate healing of the [bone], . . . meaning that where the bones were fractured, they should have united and in [Torres's] case that has yet to occur per our last clinic visit." The doctor explained that "[i]f your tibia or your shin bone is broken sufficient enough to cause it to come out of

4

the skin, . . . healing becomes very difficult, meaning that the blood supply which helps us heal the bone is significantly damaged to the point where sometimes it heals very slowly and sometimes, unfortunately, it doesn't heal at all, requiring surgical interventions beyond just one or two surgeries." For such injuries, "it's not uncommon" for a patient to require "between about four and seven surgeries and sometimes more."

Dr. Tilan performed Torres's second surgery and was familiar with what had been done during the first surgery. During the first surgery, a titanium rod and screws were placed inside the bone. Dr. Tilan removed two of the screws during the second surgery to "allow the bones to collapse on each other and hopefully stimulate . . . healing." The rod and remaining screws would have to remain in the bone permanently unless Torres sufficiently "progressed with his healing." If the bone did not heal after the second surgery, Torres "would need several other surgeries in order to get that bone to heal, and that could include putting in new hardware, taking out bone from his femur or hip or his pelvis where his belt line is to put new bone into where he had previously broken his bone. And that's one of a few options he has possibly in his future."

Dr. Tilan was "not sure" if Torres would need additional surgeries and "hop[ed]" he would not, but was "prepared to further escalate the type of surgery [Torres] would need." The doctor clarified that his "hope" that the bone would heal was "based on how [he] hope[d] for [Torres] to feel, but the decision on whether someone's healed is based on both the clinical examination and findings on x-rays or pictures of his bones to see that the bone is actually united." At Torres's next follow-up appointment, "the determination [whether to conduct further

surgery] would either be made at that time or . . . if things were moving in the correct direction, we would give him more time. But the decision to move on to the next phase should he not heal is kind of a shared decision process between [Torres] and me, which will [be made at] his subsequent clinic visits."

When asked what types of problems Torres would or could face in the future as a result of his injuries, Dr. Tilan replied: "[I]n one scenario where [Torres] no longer needs any further surgery, certainly he's at risk for chronic pain both to the knee and to the ankle, the extent of which is hard to speculate. Stiffness of the knee joint, the ankle joint, and difficulty with doing activities that normal young people do, running, hiking, jogging—all dependent upon how well he heals. But the other scenario is should [Torres] need further surgeries, he's certainly at risk for . . . complications of the surgery itself . . . and the same kind of complications going thereafter after multiple surgeries, . . . [such as a] significant amount of stiffness, scar tissue, chronic pain, and sometimes . . . a lot of these interventions don't work. And so we're left in a difficult position with a lot of our patients, trying to get them to heal."

When asked if he believed that Torres would not be able to run again, Dr. Tilan replied "it's a possibility." The doctor went on to opine it was "[l]ikely" that Torres's injured leg would "[n]ever heal in a way that it will be as good as it was prior to the accident[,]" and would "probably not" "ever heal in a way that it will be as good as the non-injured leg." The prosecution then asked: "And so is it a fair statement to say, then, that [Torres] will never have 100 percent healing in the sense that he will just in general never be in as good of shape as he was prior to the accident?" After the court overruled appellant's objection

6

grounds of speculation, Dr. Tilan replied: "Yeah. That's a fair statement."

### *Appellant's Testimony*

Appellant testified that the accident occurred while he was making a delivery for a food delivery service. He was looking toward the right side of the street for the delivery address when he drove over what he thought was a bump, rock, or pothole. He did not see anyone or hear anyone yelling; his windows were rolled up and his car radio was on. After he drove down an adjacent street and pulled over to inspect his car for damage, Juan approached him, started yelling at him in Spanish, and grabbed his car keys. Additional people arrived and surrounded him and one of them punched him in the face before they forcefully walked him back to the scene of the accident. When the police arrived, appellant falsely stated that Torres was jaywalking because he was afraid of the group of people who had surrounded him.

On cross-examination, appellant admitted falsely telling the police that his friend was driving when the accident occurred and had left on foot before Juan arrived. He also admitted telling the police he was planning to park and take a nap at the location where Juan confronted him, and that he had not felt or heard anything when he hit Torres.

### DISCUSSION

Appellant contends the evidence is insufficient to support the jury's finding that Torres suffered a permanent, serious injury as a result of the accident, as provided in subdivision (b)(2) of section 20001. We conclude otherwise.

In considering a challenge to the sufficiency of the evidence, "we review the entire record in the light most favorable to the

7

judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . . We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. . . . If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. . . . 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.'" (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) We must affirm if "'"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."'" (*People v. Rich* (1988) 45 Cal.3d 1036, 1081, italics omitted.)

Section 20001, subdivision (a) provides that "[t]he driver of a vehicle involved in an accident resulting in injury to a person, other than himself or herself, or in the death of a person shall immediately stop the vehicle at the scene of the accident and shall fulfill the requirements of Sections 20003 and 20004." Subdivision (b)(2) further provides that "[i]f the accident described in subdivision (a) results in death or permanent, serious injury, a person who violates subdivision (a) shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not less than 90 days nor more than one year . . . ." Permanent, serious injury is defined as "the loss or permanent impairment of function of a bodily member or organ." (§ 20001, subd. (d); CALJIC No. 12.70.)

Dr. Tilan offered expert testimony on the issue whether the function of Torres's leg was permanently impaired as a result of

the accident. The doctor opined that it was "likely" the leg would never be as good as it was prior to the accident, that the leg would "probably not" ever be as good as his other leg, and that Torres "will never have 100 percent healing in the sense that he will just in general never be in as a good of shape as he was prior to the accident."

Appellant does not dispute that Dr. Tilan was qualified to testify as a medical expert under Evidence Code section 720,[2] or that his testimony was "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a); see *People v. Clay* (1984) 153 Cal.App.3d 433, 459 [recognizing that "[m]edical doctors obviously have greater knowledge than lay jurors about the gravity of most injuries"]; see also *Bates v. Newman* (1953) 121 Cal.App.2d 800, 803 ["[a] medical expert may testify as to the nature of an injury or condition, the ability to inability of a person to do certain acts"]; *People v. Mayfield* (1997) 14 Cal.4th 668, 766 [same], abrogated on another ground as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390.)

Appellant nevertheless contends that Dr. Tilan's testimony provides no support for the jury's finding that Torres suffered a permanent, serious injury as provided in subdivision (b)(2) of section 20001. He claims that the doctor's opinions "consisted largely of conjecture, speculation, and a lots of 'probably(s)' and likely(s)" and that "an opinion that something is merely

---

[2] Evidence Code section 720, subdivision (a) provides in pertinent part: "A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. . . ."

9

'probable,' 'likely,' or 'more probable than not' is insufficient to satisfy a burden of proof beyond a reasonable doubt . . . ." Appellant adds that "since Dr. Tilan never discussed *how* likely and *how* probable he believed permanent impairment would be, and was never asked, his opinion could have been simply that it was more probable than not that the leg would fail to fully heal." We are not persuaded.

"'"Evidence Code section 801, subdivision (b), states that a court must determine whether the matter that [an] expert . . . reasonably can rely on 'in forming an opinion upon the subject to which his testimony relates.' . . . We construe this to mean that the matter relied on must provide a reasonable basis for the particular opinion offered, and that an expert opinion based on speculation or conjecture is inadmissible.'" [Citation.] In other words, assumptions which are not grounded in fact cannot serve as the basis for an expert's opinion: "'The expert's opinion may not be be based "on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors. . . ."'" [Citation.]" (*People v. Wright* (2016) 4 Cal.App.5th 537, 546.)

Contrary to appellant's claim, the fact that Dr. Tilan did not state his opinions to a more specific degree of certainty does not render those opinions speculative. In a criminal prosecution, "'[a] medical diagnosis based on probability . . . is admissible; the lack of scientific certainty does not deprive the medical opinion of its evidentiary value.'" (*People v. Cegers* (1992) 7 Cal.App.4th 988, 998, quoting *People v. Jackson* (1971) 18 Cal.App.3d 504, 507; see also, e.g., *People v. Stamp* (1969) 2 Cal.App.3d 203, 209, fn. 2 [medical experts' testimony that murder defendants' robbery caused the victim's fatal heart attack was sufficient to support the jury's finding of causation beyond a reasonable doubt even

though the experts stated their opinions in terms of a "medical probability, rather than actual certainty"]; *People v. McKelvy* (1987) 194 Cal.App.3d 694, 700 [in prosecution for mayhem under Penal Code section 203, medical expert testified that victim's blindness was "probably" permanent].)

Moreover, appellant's assertion that Dr. Tilan's opinions were speculative erroneously conflates the doctor's opinion that the function of Torres's leg is permanently impaired with the doctor's testimony regarding whether the leg would ever heal without further surgeries. Dr. Tilan acknowledged it was too soon to tell whether Torres's broken bones would heal without further surgeries, then set forth a "scenario" describing the issues Torres "would or could" face even if no further surgeries were necessary. Although the doctor noted that the full extent of the impairment was contingent upon how well the leg ultimately healed, this did not undermine his opinion that the function of the leg was permanently impaired. As the People aptly put it, "[t]here is nothing in the record or the law to suggest Dr. Tilan would not be able to render a reliable expert opinion on whether his patient, nine months after the injury, who still has an open wound and cannot run or work, would ever be 100 percent again."[3]

In addition to Dr. Tilan's expert opinion testimony, the jury heard Torres testify regarding the nature and severity of his

---

[3] Because appellant fails to demonstrate that Dr. Tilan's opinions were speculative, we also reject his claim that the trial court erred in overruling his speculation objection to the doctor's testimony that Torres "will never have 100 percent healing in the sense that he will just in general never be in as good of shape as he was prior to the accident."

injuries nine months after the accident. Torres also showed his injuries to the jury and testified that as a result of those injuries he had problems walking, balancing and sleeping and had been unable to return to work.

Although there are no published cases addressing the sufficiency of the evidence to support a finding of permanent, serious injury under subdivision (b)(2) of section 20001, the People draw an analogy to the crime of mayhem (Pen. Code, § 203).[4] To prove mayhem based on a disabling injury, the injury must be more than "'slight [or] temporary,'" i.e., permanent. (*People v. Santana* (2013) 56 Cal.4th 999, 1010, citing *People v. Thomas* (1979) 96 Cal.App.3d 507, 512 (*Thomas*), overruled on other grounds in *People v. Kimble* (1988) 44 Cal.3d 480, 496; CALCRIM No. 801; see also Black's Law Dict., 6th Ed. [defining "permanent" as "[g]enerally opposed in law to 'temporary'"].) The long duration of an injury, such as a broken ankle that has not fully healed after more than six months, may support an inference that the injury is permanent and that the defendant is thus guilty of mayhem. (*Santana*, at p. 1004, citing *Thomas*, at p. 512.)

Here, the jury was presented with evidence that the broken bones in Torres's leg still had not healed nine months after the accident and that his injuries impacted his ability to walk, balance, and sleep. Moreover, Dr. Tilan opined that the function of Torres's leg was permanently impaired. This evidence is sufficient to support the jury's finding that Torres suffered a

---

[4] Penal Code section 203 provides in pertinent part: "Every person who unlawfully and maliciously deprives a human being of a member of his body, or disables, disfigures, or renders it useless . . . , is guilty of mayhem."

permanent, serious injury to his leg as a result of the accident, as provided in subdivision (b)(2) of section 20001.

**DISPOSITION**

The judgment is affirmed.

<u>CERTIFIED FOR PUBLICATION.</u>



PERREN, J.


We concur:



GILBERT, P.J.



TANGEMAN, J.

Sam Ohta, Judge
Superior Court County of Los Angeles

_____

Laura R. Vavakin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Acting Senior Assistant Attorney General, Noah P. Hill, Supervising Deputy Attorney General, Heidi Salerno, Deputy Attorney General, for Plaintiff and Respondent.