[No. F025018. Fifth Dist. Sept. 26, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
DEBORAH G. ERICKSON, Defendant and Appellant.

1392

**COUNSEL**

Jim Fahey, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Robert R. Anderson, Assistant Attorney General, Michael J. Weinberger and Thomas Y. Shigemoto, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**VARTABEDIAN, J.**—This is an appeal from a conviction for first degree murder. Appellant Deborah G. Erickson claims the court impermissibly excluded important expert testimony concerning her mental state on the night of the crime. She also contends the prosecution's expert impermissibly stated his opinion concerning appellant's mental state at the time of the crime, thereby depriving her of a fair trial. We affirm the judgment.

*Facts and Procedural History*

Appellant had been sexually and physically abused by her parents as a teenager. She experienced several unsuccessful relationships as an adult, including at least one previous relationship that involved serious physical abuse of appellant by her husband.

Appellant began living with the victim, Ron Pruitt, in early 1993. Soon after appellant started living with Pruitt, he became highly critical of her, was bossy and controlling, and drank a great deal of alcohol. Appellant moved out in June of 1993; she returned in September after Pruitt agreed to go to Alcoholics Anonymous. Pruitt failed to live up to this promise, however, and his previous negative behavior increased in intensity.

Around Thanksgiving of 1993, appellant came home from work to discover Pruitt in bed with another woman. As a result, appellant and Pruitt decided appellant would continue to live in the house, but in a separate bedroom; they no longer would have a romantic relationship. Nevertheless, Pruitt made it clear he still wanted to have sex with appellant. She complied with his requests for sex as a result of physical force, threats of eviction and

threats to report appellant to the police for perceived criminal behavior.[1] Pruitt taunted appellant with claims that he knew she liked forcible sex because that was the way her father had done it. Pruitt had several guns in his home, and he threatened to kill appellant "a good two dozen times" during this period.

By July of 1994, appellant considered Pruitt's behavior intolerable. She made plans to move in with Pruitt's adult son and the son's girlfriend and to take a job where the son worked. Pruitt found out about this plan and told appellant she could neither move nor take the job; Pruitt pushed appellant around during this argument. Appellant left and spent the night at the son's house.

The next day, Pruitt went to the son's house and sent appellant home. He went to the potential employer (which was another division of the agricultural employer for whom Pruitt also worked) and arranged to cancel appellant's job offer. When Pruitt came home that evening, he was intoxicated. He argued with appellant about her plans and told her she could not move out. Pruitt became more and more intoxicated. He told appellant he would kill her if she tried to move out. Eventually, Pruitt grabbed appellant by the hair and forced her to orally copulate him. Afterwards, Pruitt pushed appellant into her bedroom. He told her that he would find and kill her if she tried leaving that night.

After Pruitt fell asleep, appellant went to a pay telephone and called her son, Keith. He told her to come to his house. Once there, appellant described to Keith the night's events. They decided to kill Pruitt; Keith would cut Pruitt's throat. Together with Keith's girlfriend, they returned to Pruitt's house.

Appellant went inside first, to make sure Pruitt was still asleep. She then summoned Keith. Keith got a knife from the kitchen. While appellant went to her own room, Keith decided he could not kill Pruitt with the knife and went outside to vomit. When he returned, Keith asked appellant to procure the handgun Pruitt kept by his bed. She got the gun. Keith took it and fired two shots into Pruitt's neck and head.

Appellant and Keith decided to make it appear Pruitt had been killed during a robbery. They removed personal property and all the guns from the

---

[1]Pruitt apparently believed appellant and her adult son, Keith, were involved in a "credit card scam" of a nature not fully explained in the record. The prosecutor's theory of the case was that appellant and Keith killed Pruitt to prevent him from going to the police about the credit card matter.

house. They threw most of these items into a lake. Appellant returned home about 6 a.m. and called 9-1-1. She and Keith initially denied any knowledge of the crime; both eventually confessed.

On October 31, 1994, appellant was charged by information with murder (Pen. Code, § 187) with a firearm enhancement (Pen. Code, § 12022, subd. (a)(1)). Jury trial began on August 28, 1995. On September 20, 1995, the jury found appellant guilty of first degree murder and found true the enhancement allegation. After denying appellant's motion for new trial, the court sentenced appellant on October 18, 1995, to a prison term of 25 years to life, plus 1 year for the enhancement. Appellant filed a notice of appeal.

*Discussion*

Appellant contends the trial court erroneously failed to admit testimony by her expert witness that he had concluded appellant feared for her life at the time Pruitt was killed. Additionally, asserts appellant, the prosecutor committed prejudicial misconduct in failing to prevent his own expert witness from testifying that appellant did not have such fear; she contends this misconduct was prejudicial even though the court struck the expert's testimony on motion of defense counsel. Before turning to the merits of these contentions, we will summarize the proceedings involving testimony of the expert witnesses.

A. *The Expert Testimony.*

By motion *in limine* at the beginning of the defense case, the prosecutor sought restrictions on "expert speculations/opinions regarding the defendant's actual state of mind at the time that this killing of Mr. Ronald Pruitt was perpetrated." After argument, the court ruled that defense experts would be able to testify with regard to battered women's syndrome, "including its physical, emotional, and/or mental effects upon [appellant's] beliefs, perceptions, or behavior. But your expert will not be able to testify as to what [appellant's] belief was or wasn't, perception was or wasn't, behavior was or wasn't." After further discussion, the court reiterated its ruling, as follows: "[Y]ou can't ask your expert did Mrs. Erickson believe this or that. You can ask your expert how did battered women's syndrome affect Mrs. Erickson's belief about this subject, perception about this subject, behavior about this subject."[2]

The first defense expert to testify was Dr. Randall Epperson, a neuropsychologist. He interviewed and administered tests to appellant. He concluded

---

[2]The parties and the literature refer variously to battered woman syndrome, battered wife (or spouse) syndrome, and battered women's syndrome. We adopt the latter usage to be consistent with Evidence Code section 1107.

appellant was a battered woman with a lifelong history of being battered. He determined she had organic brain damage in the left hemisphere, probably from birth. Appellant's verbal IQ was 74, on the borderline of being considered retarded. She suffered from learning disabilities. As a result of her various problems, she suffered from long-term depression and viewed herself as a victim in a hostile world. Epperson concluded appellant would have a very difficult time perceiving the nature of the problems that confronted her and would have a very limited capacity of reasoning out a solution to the problems. She would, in Epperson's opinion, be likely to suffer through problems, allowing her frustrations to build up. When a problem became intolerable, her response would be confused and she would not have a reasoned approach to solving the problem.

Dr. Robin Schaeffer also testified for the defense; he is a clinical psychologist with an extensive history of working with battered women. He described in detail the battered women's syndrome and the behavior associated with it. He described the characteristics commonly associated with "the battered woman." Schaeffer examined appellant. He concluded she "does fit the psychological profile of being a battered woman." When asked whether he concluded she had "any kind of disorder," he answered that she had a cognitive disorder as described by Dr. Epperson. "[H]er cognitive disabilities resulted in increased passive dependency and lack of self-reliance and . . . this made it hard for her to think through alternative solutions to her dilemma. It also made it hard for her to regulate the emotions that were generated in her by the relationship."

Defense counsel asked Schaeffer how "the fact of being a battered woman" affected appellant's perceptions of danger at the beginning of her relationship with Pruitt. He answered: "In my opinion, at the beginning . . . her experiences did not cause her to perceive herself in significant danger." Defense counsel then asked: "How about at the end of the relationship?" Schaeffer answered that appellant's "experiences caused her to perceive that her life was in danger" at the end of the relationship. The prosecutor objected and the court sustained the objection, admonishing the jury to disregard the answer.

Next, defense counsel asked Schaeffer: "Doctor, listen to me carefully: How did the battered wife syndrome affect [appellant's] perception of the imminence of danger? What was the affect [sic] of being a battered woman?" Schaeffer began to answer, "it caused her to perceive that—" The prosecutor again objected and the court instructed the witness as follows:

"Doctor, regardless of whatever her perception might be, which I ruled you cannot state, you can state how the battered wife syndrome, her experiences, would affect or lead her to come to any perception. Again, the court's ruling you can't state what she actually perceived.

"[Schaeffer]: Okay. In my opinion, at the end of—at the time frame of the end of the relationship, the battered wife syndrome caused Deborah— affected Deborah Erickson that it did have affect [*sic*] on her perception that there was a danger. [¶] . . . [¶] Also at that time the battered wife syndrome did affect her perceptions as to what measures were necessary to take [to protect herself]."

Schaeffer's testimony on direct ended with his conclusion that appellant's reduced verbal IQ meant that she had less ability than the average person to think of options to protect herself.[3]

Dr. Valerie Broin took the witness stand as the defense's final expert. She was an associate professor of philosophy at California State University, Stanislaus, and taught women's studies courses. She described battered women's syndrome generally and discussed distinguishing features of battered women who kill their batterers. She expounded on particular issues present in ordinary battering relationships and in those relationships that end in the killing of the batterer.

The prosecution's expert witness, Dr. Philip Trompetter, testified in rebuttal. He testified that he examined appellant for a total of about 11 hours. He described her psychological and intellectual makeup as he saw it. He described battered women's syndrome and concluded that appellant displayed many aspects of the syndrome, while she did not display other important aspects of it. He listed 13 common features of battered women who kill their batterers and concluded that appellant did not display those characteristics. At the close of Trompetter's testimony for the day, the prosecutor asked him: "Do you have an opinion, given your conclusion . . . that the defendant suffers from the battered women's syndrome, regarding whether that syndrome affected the defendant's perception of—of danger?" He said he did, and the prosecutor asked for the opinion. Trompetter replied: "It's my opinion that she did not view herself in imminent danger of being killed by Mr. Pruitt or even significantly harmed." On defense counsel's objection, the court instructed the jury to disregard that answer.

The next day, the prosecutor began his examination of Trompetter by asking about a hypothetical woman who lacked a substantial number of the

---

[3]Thus, at no time in Schaeffer's testimony was he asked a question in the format of "Assuming there is testimony of the accused that she was afraid that Mr. Pruitt would kill her sometime in the near future, would such fear be consistent with someone suffering from battered woman syndrome?" (Cf. *People* v. *Aris* (1989) 215 Cal.App.3d 1178, 1197 [264 Cal.Rptr. 167]; disapproved on another point in *People* v. *Humphrey* (1996) 13 Cal.4th 1073, 1086 [56 Cal.Rptr.2d 142, 921 P.2d 1].) The *Aris* court stated, "The relevance [of battered women's syndrome testimony] to the defendant's actual perception [of need to defend herself] lies in the opinion's explanation of how such a perception would reasonably follow from the defendant's experience as a battered woman."

features of a battered woman who kills, but who still suffered from battered women's syndrome and killed her batterer. He asked if such a person's perception of personal danger was affected by battered women's syndrome. Trompetter answered: "Given the inconsistencies [with the profile of battered women who kill], there would be nothing to cause a battered woman to believe that they were in imminent danger of loss of life had they stayed in that battering relationship."

B. *Battered Women's Syndrome.*

"Battered women's syndrome 'has been defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." . . . .' " (*People* v. *Humphrey, supra,* 13 Cal.4th at pp. 1083-1084, citations omitted.) It has also been described as " 'a pattern of psychological symptoms that develop after somebody has lived in a battering relationship' " (*People* v. *Aris, supra,* 215 Cal.App.3d at p. 1194), or a " 'pattern of responses and perceptions presumed to be characteristic of women who have been subjected to continuous physical abuse by their mate[s].' " (Note, *Battered Women Who Kill Their Abusers* (1993) 106 Harv. L.Rev. 1574, 1578; see also *People* v. *Romero* (1994) 8 Cal.4th 728, 735, fn. 1 [35 Cal.Rptr.2d 270, 883 P.2d 388].)[4]

■ Battered women's syndrome evidence is generally relevant in murder cases in one of two different ways. First, it may be relevant to establish self-defense, i.e., that the defendant actually and reasonably believed in the need to defend against imminent death or serious bodily injury. (*People* v. *Humphrey, supra,* 13 Cal.4th at pp. 1082, 1086.) Second, battered women's syndrome evidence may be relevant to establish "imperfect self-defense," i.e., that the defendant actually believed in the need to defend against imminent death or serious bodily injury, but the belief was objectively unreasonable. (*Id.* at p. 1082; see *People* v. *Aris, supra,* 215 Cal.App.3d at p. 1185.) In both versions of self-defense, battered women's syndrome evidence may be relevant to establish "defendant's actual, subjective perception that she was in danger and that she had to kill her husband to avoid that danger." (*Id.* at p. 1197.) Syndrome testimony also may be relevant on the issue of the defendant's credibility. (*People* v. *Day* (1992) 2 Cal.App.4th 405, 415 [2 Cal.Rptr.2d 916], disapproved on another point in *People* v.

---

[4]The traditional account of the actual psychological symptoms comprising battered women's syndrome is set forth at *People* v. *Aris, supra,* 215 Cal.App.3d at pages 1194-1195. Other commentators, while acknowledging that there is a battered women's syndrome, have challenged the empirical and logical underpinnings of the traditional account. (See, e.g., Coughlin, *Excusing Women* (1994) 82 Cal.L.Rev. 1, especially pp. 70-87.) The exact parameters of the syndrome are not an issue in the present case.

*Humphrey, supra,* 13 Cal.4th at p. 1086; see also *People* v. *Humphrey, supra,* at p. 1087.)

 While syndrome testimony has been held admissible to explain how the defendant's asserted subjective perception of a need to defend herself "would reasonably follow from the defendant's experience as a battered woman" *(People* v. *Aris, supra,* 215 Cal.App.3d at p. 1197), an expert is not permitted to testify as to the expert's opinion that the defendant *actually perceived* that she was in danger and needed to defend herself *(id.* at p. 1198). The *Aris* court based its conclusion on Penal Code section 29, which states, in relevant part: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include . . . malice aforethought . . . ."[5]

Evidence Code section 1107, subdivision (a) (hereafter, section 1107(a)), enacted after the Court of Appeal decision in *Aris* (see Stats. 1991, ch. 812, §1, pp. 3612-3613), provides: "In a criminal action, expert testimony is admissible by either the prosecution or the defense regarding battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge."

C. *Admissibility of Appellant's Proposed Expert Testimony.*

Appellant contends that section 1107(a) was intended to abrogate the holding of *People* v. *Aris, supra,* 215 Cal.App.3d at page 1198, insofar as *Aris* held inadmissible the expert's opinion concerning the defendant's actual state of mind at the time of the crime. This view is supported by 1 Witkin, California Evidence (3d ed., 1997 supp.) section 493A, pages 175-176 as follows: "[Section 1107] . . . codifies the holding in *People* v. *Aris* . . . that expert testimony regarding the battered woman syndrome is admissible to show how a particular criminal defendant's circumstances may have led to a genuine belief that serious bodily harm was imminent. *However, it abrogates the further Aris holding, as well as the provisions of [Penal Code section] 29, that prohibit the use of expert testimony to prove whether a criminal defendant had the requisite mental state.*" (Italics added.)

---

[5]*Aris* also held that battered women's syndrome testimony was inadmissible on the issue of the reasonableness of the fear of death or serious injury. *(People* v. *Aris, supra,* 215 Cal.App.3d at p. 1196; see also *People* v. *Day, supra,* 2 Cal.App.4th at pp. 414-415.) On this limited issue, both *Aris* and *Day* were disapproved in *People* v. *Humphrey, supra,* 13 Cal.4th at page 1086.

The Witkin treatise provides no further discussion of its conclusion concerning abrogation of *Aris,* and it does not cite any authority for its conclusion.

We believe appellant and the Witkin authors are wrong in this instance. ■ It is, of course, fundamental in construing a statute " 'that our primary task . . . is to determine the Legislature's intent.' . . . We must begin with the words of the statute." (*In re Christian S.* (1994) 7 Cal.4th 768, 774-775 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

■ The statute, as quoted above, permits evidence regarding "battered women's syndrome, including the physical, emotional, or mental effects upon the beliefs, perceptions, or behavior of victims of domestic violence . . . ." The Legislature's use of the phrase "victims of domestic violence" suggests a reference to victims as a class, not to "the victim" of domestic violence in a particular case before the court.

Such a class-oriented construction is fully consistent with the traditional purpose for admission of "syndrome" evidence, such as rape trauma syndrome and child molest syndrome evidence, to which battered women's syndrome evidence has been analogized in arguing for its admissibility. (See, e.g., *People* v. *Day, supra,* 2 Cal.App.4th at p. 416.) Thus, such syndrome evidence has been admitted solely to disabuse jurors of "common sense" misconceptions about the behavior of persons in the affected groups, such as rape victims and abused children, and not to prove a fact in issue. (See *People* v. *Bledsoe* (1984) 36 Cal.3d 236, 249-250 [203 Cal.Rptr. 450, 681 P.2d 291]; *In re Sara M.* (1987) 194 Cal.App.3d 585, 589-591 [239 Cal.Rptr. 605]; see also *People* v. *Humphrey, supra,* 13 Cal.4th at p. 1088.) The difficulty of establishing a scientific basis to use syndrome testimony to establish a fact in evidence has been noted. (*People* v. *Stoll* (1989) 49 Cal.3d 1136, 1161-1162 [265 Cal.Rptr. 111, 783 P.2d 698]; *People* v. *Cegers* (1992) 7 Cal.App.4th 988, 997-998 [9 Cal.Rptr.2d 297].)

In light of this historical use of syndrome evidence, it would be a dramatic departure for the Legislature to permit use of battered women's syndrome evidence to predict the actual state of mind of a particular individual at a given moment. Given the clear conflict of such a rule with the rule set forth in Penal Code section 29, as well as the scientifically controversial nature of such an undertaking, we would not expect the Legislature to "silently, or at best obscurely, decide[] so important and controversial a public policy matter and create[] a significant departure from existing law." (*In re Christian S., supra,* 7 Cal.4th at p. 782.)

Accordingly, we conclude section 1107(a) merely codifies existing rules concerning use of battered women's syndrome testimony. As such, it does

not create an exception to Penal Code section 29. The expert testimony concerning appellant's state of mind on the night of the crime was properly excluded.

In a supplemental brief, appellant argues that battered women's syndrome is not a "mental illness, mental disorder, or mental defect" within the meaning of Penal Code section 29. As a result, she argues, the testimony remains generally admissible under Evidence Code section 805, permitting otherwise admissible expert opinion testimony to address "the ultimate issue to be decided by the trier of fact," in this case, appellant's actual fear of imminent death or serious bodily injury. Appellant relies on a study published by the United States Departments of Justice and Health and Human Services, entitled, "The Validity and Use of Evidence Concerning Battering and Its Effects in Criminal Trials: Report Responding to Section 40507 of the Violence Against Women Act" (May 1996).[6] The upshot of the report, as it concerns the present issue, is that some experts have concluded that battered women's syndrome is not a mental defect.

We reject appellant's contention. All of the expert testimony before the court in this case characterized battered women's syndrome as a mental defect. The trial court was entitled to rely on that characterization by the parties and the experts in ruling on the admissibility of the experts' opinions.

### D. *Alleged Prosecutorial Misconduct.*

■ Appellant's final contention is that the prosecutor committed misconduct in failing to ensure that his expert would not give testimony in violation of the court's *in limine* order. As noted in our summary of the experts' testimony, Dr. Trompetter testified: "It's my opinion that [appellant] did not view herself in imminent danger of being killed by Mr. Pruitt or even significantly harmed." On objection by defense counsel, the court instructed the jury to disregard that testimony. Despite the court's action, appellant contends the testimony was prejudicial: "the fact remains that the doctor's improper opinion concerned the most important issue in the case, and was the last piece of testimony the jurors heard on that date—thus ensuring it would stay in . . . their minds overnight, if not a good deal longer."

---

[6]We deny appellant's application for judicial notice of this report. As appellant notes, the report is secondary authority to which courts traditionally refer without the taking of judicial notice. (See *Earl W. Schott, Inc.* v. *Kalar* (1993) 20 Cal.App.4th 943, 946, fn. 4 [24 Cal.Rptr.2d 580].)

In the first place, we strongly doubt that this issue was preserved for appeal. Defense counsel made an ordinary evidentiary objection and received a favorable ruling on it. ■ In order to preserve alleged misconduct for review, the defendant must "assign misconduct and request appropriate admonitions," unless an admonition could not have cured the harm from the misconduct. (*People* v. *Gionis* (1995) 9 Cal.4th 1196, 1215 [40 Cal.Rptr.2d 456, 892 P.2d 1199].)

■ Secondly, the stricken testimony did not render the trial fundamentally unfair, nor did the prosecutor's failure, if any, to prevent the testimony amount to "a deceptive or reprehensible method of persuasion. Accordingly, it did not constitute misconduct under federal or state standards." (*People* v. *Gionis, supra,* 9 Cal.4th at pp. 1218-1219; see also *People* v. *Padilla* (1995) 11 Cal.4th 891, 939 [47 Cal.Rptr.2d 426, 906 P.2d 388].)

Finally, there is nothing in the record that leads us to conclude the jury would not have complied with the court's admonition to disregard the testimony. Throughout the testimony of both defense and prosecution experts, there was constant debate and instruction on the exact limits of such testimony. In fact, the court similarly admonished the jury to disregard testimony of a defense expert that was precisely the mirror image of Trompetter's statement. We are confident the jury was as able to follow the court's admonition in Trompetter's case as it was in the case of the defense expert. Accordingly, we conclude the prosecutorial misconduct, if it occurred and if it is reviewable on this appeal, was not prejudicial. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

## DISPOSITION

The judgment is affirmed.

Ardaiz, P. J., and Wiseman, J., concurred.

A petition for a rehearing was denied October 7, 1997, and appellant's petition for review by the Supreme Court was denied January 14, 1998.