[No. F035439. Fifth Dist. May 2, 2002.]

THE PEOPLE, Plaintiff and Respondent, v.
NATALIE LYNN JASPAR, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, V and VI.

**COUNSEL**

Patricia L. Watkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Acting Assistant Attorney General,

J. Robert Jibson and Janine R. Busch, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**VARTABEDIAN, J.**—Defendant Natalie Lynn Jaspar shot her boyfriend, Thomas Hines, in the back of the head, causing his death. An expert witness testified for the defense on the subject of battered woman syndrome (BWS). Defendant was convicted of second degree murder. On appeal, she contends the instruction given to the jury on BWS allowed the jury to consider syndrome evidence on the question of self-defense but precluded the jury from considering the syndrome on the question of unreasonable self-defense. In addition, she raises claims of ineffective assistance of counsel, instructional error, and sentencing errors. We affirm, except to direct a correction in the abstract of judgment.

FACTS

*Prosecution*

The on-again, off-again relationship of defendant and Thomas Hines ended on October 3, 1998, when defendant shot and killed Hines. James C., a minor at the time, witnessed the shooting.

James C. lived approximately one-quarter mile from the home defendant and Hines shared. He first met Hines when he went to the home and asked Hines if he raised fighting roosters. Hines raised fighting roosters, which interested James C., and the two became friends. James was on home study from school and Hines was unemployed. They saw each other almost every day and spent their time riding and working on three-wheelers, "doing things with the chickens," and smoking methamphetamine.

One evening, approximately two weeks before Hines was killed, James was at home when Hines arrived on a motorcycle. James's cousin, Keith, was present that evening. Hines told James that defendant was shooting at him. Hines was frantic. Hines said he and defendant had been arguing, he got on his motorcycle to leave, and defendant shot at him. One bullet went past his ear; the other hit the front fender of the motorcycle. Hines had a bag of chicken dust (a powder sprinkled on chickens to kill bugs) on the front of the motorcycle when defendant fired the shots. When Hines arrived at James's, he had chicken dust on his clothing.

Hines remarked he had to leave. The headlight on his motorcycle did not work. He was worried defendant would see him, so he, James, and Keith

pushed the motorcycle out behind the house and they tried to fix the headlight. They were unable to fix it, so they took the bike inside the house. The bike had a bullet hole in the front fender. They were still unable to fix the light, so Hines stayed until dawn.

On October 3, 1998, Hines went to James's house and asked James if he would help him move his belongings out of the house he had shared with defendant. James agreed to help and they went to the home in a truck Hines had borrowed. As they walked up to the house, Hines told James to wait outside. James sat down outside. James heard defendant and Hines arguing inside the house for two or three minutes.[1]

Hines came out of the house. He was carrying a clock and a propane tank in his hands. Defendant came out of the house and threw a helmet at Hines. The helmet hit Hines in the back of the head. Hines turned around and defendant slammed the door. Hines picked up the helmet and walked towards the gate. James joined Hines and they walked towards the truck. Hines made a derogatory comment regarding defendant to James.[2]

James heard a shot and Hines fell to the ground. James saw blood on Hines. James ran back to the house and asked defendant why she shot Hines. He told defendant that she had hurt Hines. Defendant replied, "[G]ood." James went back to assist Hines. Defendant came out and James told her to call an ambulance.

Alan Avalos lived across the street from defendant. On October 3, 1998, defendant came to his house and asked to use the telephone to call 911. She said she had just shot her boyfriend.[3] Avalos called the police.

Dr. Dianne Vertes performed the autopsy. It was her opinion Hines died from a gunshot wound to the head. The bullet entered on the back right side of his neck, traveled up to the left side, then down. The bullet was deformed as it traveled and struck bones in the head. Based on the appearance of the entrance wound, she concluded the bullet was not deformed before it made its entrance into the neck. Hines had methamphetamine in his system when he died.

---

[1] When initially interviewed, James said the argument lasted for 10 minutes. At the preliminary hearing, James testified the argument lasted five to 10 minutes.

[2] In a previous statement, James said that after Hines was hit with the helmet Hines was mad, turned around, and took one to two steps toward defendant. After defendant shut the door, Hines turned back.

[3] On cross-examination Avalos testified that defendant stated she had accidentally shot her boyfriend and that she was frantic and hysterical.

Shortly after the killing, Detective Jennifer Heckathorn checked defendant for injuries. With the exception of a small bruise under one of her knees, defendant did not have any visible injuries.

Detective Lance Olsen interviewed defendant shortly after the killing. The tape of the interview was played for the jury. Defendant admitted shooting Hines but said she did not intend to. She stated Hines had moved most of his belongings out of their house during the last month. She had an eviction notice and thought Hines was coming over to help her move the rest of her belongings. She realized he was only there for his belongings and not to help her. They argued over the helmet, he left, and she threw the helmet at him. He came back and threw her down, hit her, pulled her hair, called her names, and kicked her. Hines left the house and defendant stood at the back door and fired a shot to the left and up. She fired the gun out the door, hoping it would cause Hines to leave, as it had done so before. When James told her that Hines had been shot, defendant said "good" because she thought James was kidding. Defendant said she had shot at Hines before.

Several witnesses testified they had seen defendant shooting at targets. She knew how to load guns, fire them, and hit targets. In 1991, defendant completed a firearms program. This course taught firearm safety, familiarization with firearms, and proficiency.

*Defense*

A number of friends and neighbors of defendant testified to numerous occasions while she was living with Hines when they saw her with bruises, black eyes, welts, swollen lips, knots on her head, and hair missing. Defendant became more and more isolated while living with Hines. In one instance defendant went to the home of a childhood friend, Barbara Lutes. She told Lutes she and Hines had argued and Hines threw her out the door, then took her head and ground her face into the gravel. Lutes helped pick the gravel out of defendant's hair and face. Hines referred to defendant in very derogatory terms. More than one individual saw Hines batter defendant. Defendant would wear sunglasses and long sleeves to hide her injuries.

Michelle Fox, a forensic scientist, opined that the holes in the fender of the motorcycle driven by Hines were not consistent with a .22-caliber bullet (the type fired from the weapon that killed Hines).

James Blankenship, a pharmacist, testified that a high level of methamphetamine in a person's system could have a significant effect on a person. It can cause aggressive and violent behavior.

Dr. William Ernoehazy, a retired forensics pathologist, testified it was his opinion that the bullet that struck Hines hit something else before it hit Hines. He based this analysis on the entry wound and the shape of the bullet retrieved during the autopsy.

Defendant testified on her own behalf. She testified that all of the injuries detailed earlier by the witnesses were inflicted upon her by Hines. She stated Hines caused her to become isolated from her family and friends. Whenever Hines was arrested for domestic violence against defendant, Hines would force her to recant her accusations. She recounted an earlier incident when Hines was roughing her up. Hines mocked defendant. She screamed at him to leave but Hines kept carrying on, so defendant loaded the gun and shot it out the door. Hines left. She fired the shot so Hines would leave. She did not see Hines again until October 3.

On October 3, 1998, defendant was not expecting Hines to come over. He came over and they slept for awhile. Hines left and defendant left. When defendant returned, Hines was there with James. Defendant called Hines a derogatory name. Hines came in the house and asked defendant what her problem was. Defendant told him she wanted him to leave. Hines grabbed the helmet on the table. Defendant said it was hers. Hines tossed the helmet on the table, called defendant a derogatory name and went outside.

Defendant threw the helmet at Hines. Hines came inside, threw defendant around the kitchen, and kicked her in the stomach. Hines went outside. Defendant was worried that Hines would come back in the house. She loaded the .22, opened the back door, and shot the gun into the air. She did not aim. She shot the gun to make Hines leave because she knew that if he came back, he would hit her. When James told her she had shot Hines, she said "good" because she thought James was kidding.

Linda Barnard, a marriage and family therapist and an expert on traumatic stress, testified regarding BWS. Her definition of a battered woman "is a woman who has been physically, sexually or seriously psychologically abused by a person with whom she is in an intimate relationship." She described common characteristics of a battered woman. "Some of those common things that we see are depression, fear, minimizing of the extent of the violence in their life, attempts to try to comply or please the batterer, the person that's perpetrating violence against them, anxiety.

"We often see sleep disturbance. We see various psychological responses that are called psychological or emotional numbing which can include things as a psychological term called ['dissociation'] where the person sort of

emotionally splits off from their feelings. Sometimes they also do that with substance abuse, with alcohol or drugs.

"We also see sometimes a lot of minimizing. . . . Hypervigilance, where the person has an extreme startle response or they are trying to scan for their environment to try to minimize any future violence or anticipate what might happen. There is a whole list of different things that we frequently see with battered women."

It was Barnard's opinion that defendant was a battered woman and experienced BWS. A person suffering from the syndrome will have a greater response to a threatening situation because of the history that she has with the batterer.

*Rebuttal and Surrebuttal*

Green, a niece of Hines, testified that she had seen defendant initiate violence with Hines. James also testified that he had seen defendant start violence with Hines on numerous occasions, trying to get him to hit her.

Dr. Vertes disagreed with Dr. Ernoehazy's ricochet theory because the entrance wound to Hines was small and regular.

Defendant testified that the testimony of Green and James was untrue.

DISCUSSION

I. *BWS Instruction*

■ "The subjective elements of self-defense and imperfect self-defense are identical. Under each theory, the appellant must actually believe in the need to defend himself against imminent peril to life or great bodily injury." (*People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1262 [115 Cal.Rptr.2d 229].) "For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend. [Citation.] If the belief subjectively exists but is objectively unreasonable, there is 'imperfect self-defense,' i.e., 'the defendant is deemed to have acted without malice and cannot be convicted of murder,' but can be convicted of manslaughter. [Citation.] To constitute 'perfect self-defense,' i.e., to exonerate the person completely, the belief must also be objectively reasonable." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 [56 Cal.Rptr.2d 142, 921 P.2d 1], fn. omitted.) "If the trier of fact finds the requisite belief in the need to defend against imminent peril, the choice between self-defense and imperfect self-defense properly

turns upon the trier of fact's evaluation of the reasonableness of appellant's belief." (*People v. Viramontes, supra,* at p. 1262.)

■ "In a criminal action, expert testimony is admissible by . . . the defense regarding [BWS], including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence. . . ." (Evid. Code, § 1107.) " '[BWS] "has been defined as 'a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives.' . . ." ' [Citation.] It has also been described as ' "a pattern of psychological symptoms that develop after somebody has lived in a battering relationship" ' [citation], or a ' "pattern of responses and perceptions presumed to be characteristic of women who have been subjected to continuous physical abuse by their mate[s]." ' [Citations.]" (*People v. Erickson* (1997) 57 Cal.App.4th 1391, 1399 [67 Cal.Rptr.2d 740].)

■ There are generally three different purposes for which BWS evidence is relevant in murder cases. First, BWS testimony is relevant to a defendant's credibility because it assists " 'the jury in objectively analyzing [the defendant's] claim of self-defense by dispelling many of the commonly held misconceptions about battered women.' " (*People v. Humphrey, supra,* 13 Cal.4th at p. 1087.)

Next, for both perfect and imperfect self-defense California requires that the defendant hold an honest belief that he or she is in imminent danger of death or great bodily injury from the victim. BWS is relevant to prove the defendant honestly believed she needed to defend against imminent death or great bodily injury. (*People v. Erickson, supra,* 57 Cal.App.4th at p. 1399; *People v. Aris* (1989) 215 Cal.App.3d 1178, 1185 [264 Cal.Rptr. 167], disapproved on another point in *People v. Humphrey, supra,* 13 Cal.4th at p. 1086.)

The third purpose for which BWS testimony is relevant in a murder case, reasonableness, was established in *People v. Humphrey, supra,* 13 Cal.4th 1073. In *Humphrey,* the defendant was charged with murder. She testified regarding abuse she encountered from the victim, and an expert testified on BWS. The defendant was convicted of voluntary manslaughter. (*Id.* at pp. 1080-1081.) The jury was instructed it "could consider the evidence [of BWS] in deciding whether the defendant actually believed it was necessary to kill in self-defense, but not in deciding whether that belief was reasonable." (*Id.* at p. 1076.) The Supreme Court found that the trial court should have allowed the jury to consider the BWS testimony "in deciding the reasonableness as well as the existence of defendant's belief that killing was necessary." (*Id.* at pp. 1076-1077.)

In addition to the actual subjective belief discussed above, in order for a defendant to be acquitted based on self-defense, it must be shown the belief is objectively reasonable. In assessing objective reasonableness, "a jury must consider what 'would appear to be necessary to a reasonable person in a similar situation and with similar knowledge. . . .' [Citation.] It judges reasonableness 'from the point of view of a reasonable person in the position of defendant. . . .'" (*People v. Humphrey, supra*, 13 Cal.4th at pp. 1082-1083.) "Although the ultimate test of reasonableness is objective, in determining whether a reasonable person in defendant's position would have believed in the need to defend, the jury must consider all of the relevant circumstances in which defendant found herself." (*Id.* at p. 1083.)

The court in *Humphrey* disagreed with earlier Court of Appeal decisions that held that BWS is irrelevant to reasonableness. "Those cases too narrowly interpreted the reasonableness element. . . . [They] failed to consider that the jury, in determining objective reasonableness, must view the situation from the *defendant's perspective*." (*People v. Humphrey, supra*, 13 Cal.4th at p. 1086.) The Supreme Court illustrated its point as follows: "Here, for example, Dr. Bowker [the expert on BWS] testified that the violence can escalate and that a battered woman can become increasingly sensitive to the abuser's behavior, testimony relevant to determining whether defendant reasonably believed when she fired the gun that this time the threat to her life was imminent. Indeed, the prosecutor argued that, 'from an objective, reasonable man's standard, there was no reason for her to go get that gun. This threat that she says he made was like so many threats before. There was no reason for her to react that way.' Dr. Bowker's testimony supplied a response that the jury might not otherwise receive. As violence increases over time, and threats gain credibility, a battered person might become sensitized and thus able reasonably to discern when danger is real and when it is not. '[T]he expert's testimony might also enable the jury to find that the battered [woman] . . . is particularly able to predict accurately the likely extent of violence in any attack on her. That conclusion could significantly affect the jury's evaluation of the *reasonableness* of defendant's fear for her life.' [Citation.]" (*People v. Humphrey, supra*, at p. 1086.) Thus, BWS is relevant to the question of whether defendant's actual belief is reasonable.

The above three categories of admissible purposes of BWS evidence have been organized a bit differently into the four purposes stated in CALJIC No. 9.35.1. The trial court here utilized a modified version of CALJIC No. 9.35.1 and instructed the jury as follows on BWS (as reflected in the written instructions given to the jury): "Evidence has been presented to you concerning [BWS]. You should consider this evidence for certain limited purposes only, namely, [¶ 1) that the Defendant's reactions, as demonstrated by

the evidence, are not inconsistent with her having been a victim of domestic violence; [¶ 2) the beliefs, perception or behavior of victims of domestic violence; [¶ 3) proof relevant to the believability of the defendant's testimony; [¶ 4) *whether the defendant actually and reasonably believed in the necessity to use force to defend herself against imminent peril to life or great bodily injury.* In assessing reasonableness, the issue is whether a reasonable person in the Defendant's circumstances would have seen a threat of imminent injury or death, and not whether killing the alleged abuser was reasonable in the sense of being an understandable response to ongoing abuse. An act that appeared to be an understandable response is not necessarily [an] act that was reasonable under the circumstances." (Italics added.)

██  Defendant claims the instruction given by the trial court on BWS contained erroneous language because the phrase "actually and reasonably believed" limited consideration of BWS to self-defense, and thereby precluded the jury from considering BWS on the question of imperfect self-defense.

Although the instruction stated generally that the jury should consider BWS on the question of the beliefs, perception, or behavior of victims of domestic violence, the portion italicized above appears to limit consideration of the evidence of BWS to whether the defendant *actually and reasonably believed* in the necessity to use force. This fourth paragraph may give the impression that BWS should be considered for self-defense but not imperfect self-defense. However, if a jury concludes that after considering BWS the defendant's belief was unreasonable, then the jury should properly confront the issue of imperfect self-defense, which turns on whether the belief is an actual, honest belief.

The self-defense instructions contained repeated references to the *actual and reasonable belief* of the defendant.[4] In contrast, the imperfect self-defense instructions repeatedly referred to an *actual and unreasonable belief*

---

[4]CALJIC No. 5.12 states in part: "The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing *actually and reasonably believes* . . . ." (Italics added.) CALJIC No. 5.13, as given by the trial court, states in part: "Homicide is justifiable and not unlawful when committed by any person in the defense of herself if she *actually and reasonably believed* that the individual killed intended to commit a forcible and atrocious crime. . . ." (Italics added.) CALJIC No. 5.51, as given by the trial court, states in part: "Actual danger is not necessary to justify self-defense. If one is confronted by the appearance of danger which arouses in her mind, as a *reasonable person, an actual belief* and fear that she is about to suffer bodily injury, and if a *reasonable person* in a like situation. . . ." (Italics added.)

requirement.[5] Although the fourth purpose set forth in CALJIC No. 9.35.1 was potentially confusing and/or misleading by expressly referring only to *actual and reasonable belief*, it did not explicitly preclude consideration of BWS as a means to direct the jury to the question of imperfect self-defense upon its rejecting self-defense because the defendant's belief was not reasonable. (Cf. *People v. Humphrey, supra*, 13 Cal.4th 1073 [court told jury it could not consider the evidence for certain purposes].)

We further note that CALJIC No. 9.35.1 as given to this jury concluded with advice on "assessing reasonableness," strongly suggesting that the preceding language is not meant to confine the use of BWS evidence to the issue of self-defense alone; instead the jury is more generally allowed to assess whether defendant's conduct was reasonable or unreasonable. As the Use Note to CALJIC No. 9.35.1 explains, "The fourth bracketed purpose deals with perfect and imperfect self-defense if those issues are raised." (Use Note to CALJIC No. 9.35.1 (6th ed. 1996) p. 620.)

In addition, the instructions on unreasonable self-defense (CALJIC No. 5.17) stated that "a person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury, kills unlawfully, but does not harbor malice aforethought and is not guilty of murder. This would be so even though a reasonable person in the same situation seeing and knowing the same facts would not have had the same belief." The combination of instructions allowed the jury to consider defendant's subjective state of mind and informed the jury that for unreasonable or imperfect self-defense, the defendant is not held to the standard of a reasonable person.

In his closing argument to the jury, the prosecuting attorney discussed voluntary manslaughter as distinguished from murder. He stated: "The absence of malice aforethought is instead replaced. In this situation, the proposal is that now we have an imperfect self-defense. That's what the [BWS] testimony to you is all about. The theory being that defendant entertained a genuine but unreasonable belief in the necessity to defend one's self, herself, against imminent peril to life or great bodily injury. That's how that works." The prosecutor went on to discuss how the beatings of defendant were the basis for unreasonable self-defense.

---

[5]In defining voluntary manslaughter, CALJIC No. 8.40, as given by the trial court, states in part: "There is no malice aforethought if the killing occurred in the *actual but unreasonable belief* in the necessity to defend oneself against imminent peril to life or great bodily injury." (Italics added.) CALJIC No. 8.50 sets forth the distinctions between murder and manslaughter and, as given by the trial court, provides in part: "when the act causing the death, though unlawful, is done in the *actual but unreasonable belief* in the necessity to defend against imminent peril to life or great bodily injury. . . ." (Italics added.) (See also CALJIC No. 5.17, quoted above.)

Defense counsel emphasized self-defense and BWS, but also said that syndrome testimony was important to the question of an honest belief, even if the belief turns out to be unreasonable. Defense counsel stated the jury had to look at the evidence from the perspective of victims of domestic violence.

In his final argument to the jury, the prosecuting attorney again stated that the defense was relying on the fact that defendant was a battered woman and that she harbored an actual but unreasonable belief that Hines constituted an imminent threat of death or great bodily injury to her.

Although an instruction, or in this case a portion of an instruction, might by itself be misleading, the potentially misleading instruction should not be reviewed in isolation. It is proper to review the instruction in combination with other instructions and/or the argument of counsel in determining if the instruction challenged on appeal confused the jury. (*People v. Holt* (1997) 15 Cal.4th 619, 699 [63 Cal.Rptr.2d 782, 937 P.2d 213]; *People v. Medina* (1995) 11 Cal.4th 694, 779 [47 Cal.Rptr.2d 165, 906 P.2d 2]; *People v. Garceau* (1993) 6 Cal.4th 140, 189 [24 Cal.Rptr.2d 664, 862 P.2d 664].)

Defendant argues in her reply brief (without citation to authority) that respondent is in error in claiming that closing arguments cured any error. She claims the jury was properly instructed that argument is not evidence and was repeatedly told it must limit its determination to the law as stated by the court. ■ While it is true that argument is not evidence and the jury must limit its determination to the law as stated by the court, we may properly review counsel's arguments to determine if counsel clarified or exacerbated a potentially confusing instruction. Here, arguments by counsel clarified any potential confusion.

■ We find the fourth purpose stated in CALJIC No. 9.35.1 to be potentially confusing in this case when read in isolation.[6] But, when read in conjunction with the entire instruction and the other instructions, and when combined with the arguments of counsel, the potential for confusion was dissipated. We therefore reject defendant's claim that CALJIC No. 9.35.1 limited the application of BWS evidence to perfect self-defense, and after an

---

[6]We suggest that in future cases the bracketed language of CALJIC No. 9.35.1 concerning the fourth limited purpose for which BWS should be considered would be improved by changing *"whether the defendant actually and reasonably believed in the necessity to use force to defend herself against imminent peril to life or great bodily injury"* to read *"whether the defendant actually believed in the necessity to use force to defend herself against imminent peril to life or great bodily injury and whether such belief was reasonable or unreasonable."*

examination of the entire record we further find the trial court's instructions did not confuse the jury.[7]

II.-VI.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

We direct the trial court to correct the abstract of judgment to reflect that imposition of sentence on the Penal Code section 12022.5 enhancement is stayed. In all other respects, the judgment is affirmed.

Ardaiz, P. J., and Harris, J., concurred.

A petition for a rehearing was denied May 22, 2002, and appellant's petition for review by the Supreme Court was denied August 14, 2002. Baxter, J., did not participate therein. Kennard, J., and Moreno, J., were of the opinion that the petition should be granted.

---

[7]We note the instructions given in this case stated that voluntary manslaughter requires intent to kill. As set forth in *People v. Blakeley* (2000) 23 Cal.4th 82 [96 Cal.Rptr.2d 451, 999 P.2d 675] and *People v. Lasko* (2000) 23 Cal.4th 101 [96 Cal.Rptr.2d 441, 999 P.2d 666], a killing that occurs as a result of unreasonable self-defense or in a heat of passion is voluntary manslaughter, regardless of whether there is an intent to kill. The defendant has not challenged her conviction based on this instructional error. While we are not called upon to decide whether any such error caused prejudice, our review of this record fails to suggest prejudice.

*See footnote, *ante*, page 99.