Filed 10/30/15  P. v. Adino CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NORBERTO ANDINO et al.,<br><br>    Defendants and Appellants. | B253131<br><br>(Los Angeles County<br>Super. Ct. No. KA097402) |

        APPEALS from judgments of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed.

        Kenneth H. Lewis and Stephen G. Rodriguez for Defendant and Appellant Lucio Rios Llanos.

        Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Norberto Andino.

        Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jason C. Tran and Jonathan J. Kline, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury rejected Lucio Rios Llanos's and Norberto Andino's defense theory that they committed grand theft by trick and found both defendants guilty of kidnapping for robbery. The jury's verdict included findings that various firearm enhancements alleged as to both defendants were not true. The trial court sentenced Llanos and Andino to the prescribed term of life with the possibility of parole. We affirm.

## GENERAL BACKGROUND

The prosecution's theory at trial was that Llanos and Andino and a third person (Ortiz) acted together to kidnap Tarlock Singh for purposes of robbery, threatening to harm him and his family if he did not withdraw money at his bank and turn over thousands of dollars of watches bought at a jewelry store with his credit cards.[1] Singh testified that Andino and Ortiz showed Singh a gun and ordered him into his car, then took him around town, ordering him to get money and buy Rolex watches. During these events, the two kidnappers telephoned a third person, Llanos, who was purportedly waiting outside Singh's home to harm his family in case he failed to cooperate.

Llanos's and Andino's common defense theory at trial was that they committed only grand theft by trick. They claimed they scammed Singh into believing they had a winning lottery ticket worth approximately $3 million and that Singh would receive $1 million of the prize money if he provided the lottery officials with the appropriate identification and bank account information and gave Andino a down payment as security for him giving Singh the ticket to procure the winnings. To get the money for the payment, they claimed Singh willingly withdrew money from his bank accounts and credit cards and also gave them Rolex watches he purchased that day.

In convicting Llanos and Andino of kidnapping for robbery, the jury necessarily believed beyond a reasonable doubt that threats of harm were used; at the same time, the jury did not believe beyond a reasonable doubt that a gun had been used.

---

[1] Luis Ortiz, also known as Robert Morales, was arrested in May 2013, about two weeks after Llanos and Andino were convicted. There are representations in the briefs that Ortiz was later prosecuted for his part in the events involving Singh.

2

**FACTS**

**The Kidnapping for Robbery Events**

On November 9, 2011, Singh left his home in Diamond Bar to go to work. Singh left his cell phone in his brother's car a few days earlier and it had not been returned to him by this time. On his way to work, Singh stopped at a Bank of America on Diamond Bar Boulevard to deposit $500. As he returned to his car, Singh saw Ortiz standing nearby.[2] Ortiz had a piece of paper in his hand, and seemed to ask Singh for directions. Singh said he could not help because he did not understand enough English. At that point, Andino walked toward them. Singh suggested that Ortiz talk to Andino, and started to get into his car.

Andino and Ortiz followed Singh into his car. Andino got in the front passenger seat and Ortiz sat in the back. Andino showed Singh a part of a gun and ordered him to start the car; Singh did so because he was afraid. Singh drove out of the Bank of America parking lot. As they drove past a CVS store, Andino told Singh to enter the parking lot and stop the car. Andino asked for Singh's home address. Andino then called someone on a cell phone, telling that person, "This is the address and this is where I need you to go." Singh was frightened because his wife and mother were at his home. While still in the parking lot, Andino received a phone call. Singh heard Andino say something to the effect, "The address I gave you, have you already arrived at that address? Okay. So you're there now."

Andino got out of the car and walked into a nearby Chase Bank while Ortiz remained in the car with Singh. Andino returned to Singh's car about 15 minutes later with a bank envelope that appeared to contain money. Andino ordered Singh to move to the front passenger seat and Andino got in the driver's seat. Andino drove to a Bank of America on Azusa Avenue in Hacienda Heights. Andino ordered Singh to hand over his wallet, and Singh complied because he was afraid; he did not try to escape because he

---

[2] Ortiz was identified in papers submitted on the motion for new trial as "Roberto Morales."

3

had kidney problems and could not move very quickly. Andino removed Singh's credit cards from his wallet and began calling the credit card companies. He ordered Singh to answer the security questions. Andino wrote down the cash limits on Singh's credit cards and then told him to enter the bank and withdraw those amounts.[3]

Singh entered the Bank of America alone and filled out a withdrawal slip. When the teller told Singh that he could not withdraw the amount of money that he wanted, he returned to his car and told Ortiz and Andino what the teller had said. Ortiz and Andino told Singh to go back to the bank and withdraw whatever money he could. Singh went back inside the bank and withdrew $2,500 from his bank account, and obtained a $4,800 cash advance. He returned to his car and gave the money to Andino.

Andino next drove to a Ben Bridge Jewelers store in a strip mall in Montclair where Andino ordered Singh to go in the store and buy three watches. When the store did not have the watches that Andino wanted, Singh returned to the car. Andino then instructed Singh to buy three bracelets that cost around $5,000 each. When Singh went back into the store, it had gotten busy, and Singh was unable to talk to an employee for some time. Andino came into the store and told Singh to "hurry up," then apparently went back outside. Singh did not buy the bracelets because the store did not have any in the price range that Andino had specified.

Finally, Andino drove to Bhindi Jewelers in Artesia where Andino told Singh to go inside and purchase three Rolex watches for $5,000 each. Singh entered the store alone and, using his credit card, purchased three watches at a total price of $12,900, after negotiating with a store employee. Andino then drove to another shopping center where Andino and Ortiz got out of the car and walked away. Singh drove to his business, which was located nearby, and called his wife. According to Singh, neither Andino nor Ortiz said anything about a winning lottery ticket at any time during the entire ordeal.

---

[3]     Prosecution evidence at trial showed that, on November 9, 2011, Bank of America received one telephone inquiry on Singh's personal Visa credit card and three telephone inquiries on his business credit card. All of these inquiries were made from Andino's phone.

4

Meanwhile, Singh's wife, Pia Kaur, began to grow worried when she did not hear from her husband. Singh was in the habit of calling her every day when he arrived at work because of his health problems. When she did not receive a call from him, she began calling his store repeatedly. His employee, however, kept telling her that Singh had not arrived. Worried that something had happened, Kaur began to call family members and informed them of the situation. Various family members began to show up at Kaur's house. Kaur called Singh's cell phone three times. On her third call, the phone was answered by Kaur's brother-in-law, who told her that the phone had been in his restaurant for the past two days. Kaur's brother started calling local police departments and hospitals. At around 4:45 p.m., Singh finally called Kaur. Crying, he told her, "I'm at the store. Please come and get me." Kaur sent their daughter to pick him up. When Singh arrived home, he seemed frightened and was "almost crying."

Cell phone records for November 9, 2011, showed the following: Andino's cell phone and Llanos's cell phone called each other 17 times between 10:54 a.m. and 4:19 p.m. Added together, the calls lasted more than five hours.

According to Raymond MacDonald, a member of the Law Enforcement Relations Group for T-Mobile Wireless Phone Company, when a subscriber makes a call on his cell phone, the call will initiate on a nearby cell tower, usually the closest one. Under normal circumstances, the furthest away an initiating cell phone tower can be is three miles. T-Mobile has the capability of providing law enforcement with the locations of cell towers used by particular phones.

The following calls were traced to the listed cell towers: At 5:34 a.m., Andino's phone used a cell tower located about four-tenths of a mile from the Ramada Inn in Commerce. At 9:51 a.m., it used a cell tower located about 150 yards from the Bank of America in Diamond Bar. At 10:54 a.m., in receiving a call from Llanos's phone, it used a cell tower located about three-tenths of a mile from the Chase Bank in Diamond Bar. At 12:27 p.m., it used a cell tower located about one-tenth of a mile from the Bank of America in Hacienda Heights. At 1:31 p.m., in a call to Ben Bridge Jewelers, it used a cell tower located approximately two-tenths of a mile from Ben Bridge Jewelers in

5

Montclair. At 3:25 p.m., it used a cell tower located approximately eight-tenths of a mile from Bhindi Jewelers in Artesia. At 4:26 p.m., it used a cell tower located about five-tenths of a mile from the intersection of 183rd Street and Norwalk Boulevard in Artesia. And at 6:54 p.m., it used the cell tower located about four-tenths of a mile from the Ramada Inn in Commerce.

*Andino's and Llanos's Subsequent Arrest and the Criminal Case*

On April 2, 2012, about five months after the kidnapping, Miami Dade Police Department Detective Jason Del Santo and his partner were directed to arrest Andino at his residence in Miami. When the officers went to the front door, Andino looked through the peep-hole of the door and then attempted to flee through the back yard. Detective Del Santo took him into custody. Detective Del Santo recovered a wallet from Andino. A Commerce Casino player's card was recovered from Andino's wallet.

Detective Del Santo also arrested Llanos. A sweater was found in the trunk of Llanos's car. Llanos said the sweater belonged to a friend who was then in Colombia, and that he was taking it to the dry cleaner as a favor. Llanos denied that a person wearing a similar sweater in a photograph supplied by Los Angeles detectives was him. He denied that he had ever been to California. He claimed that he had not been on an airplane since he flew to Colombia eight months earlier. When Llanos's residence was searched, a hat with the words "Fisherman's Wharf, San Francisco" was found on a dresser in his bedroom along with an empty Rolex box.

Los Angeles County Sheriff's Department (LASD) Detective Gittens and Lorenz, along with Miami Dade Detective Elena Hernandez, interviewed Andino after his arrest. Andino said that he had been in California two months earlier. When asked why he went there, he said he did not want to answer. Andino identified himself and the man in the sweater ("Miguel") from a set of photographs. When Detectives Gittens and Lorenz pressed Andino on the identity of the other man, asking him, "Do you call him Lucio? Do you call him Rios? Do you call him Llanos?" Andino responded, "Lucio." Andino admitted to staying at a Ramada Hotel during his trip to California and said it was near a

casino. One of the detectives asked Andino why he would go all the way to Los Angeles to "rob somebody," Andino answered, "I have a family to take care of."

In September 2012, the People filed an information jointly charging Andino and Llanos with kidnapping to commit robbery, in violation of Penal Code[4] section 209, subdivision (b)(1). The information further alleged that Andino personally used a firearm in the commission of the offense, and that a principal was armed with a firearm. (§§ 12022.5, subd. (a); 12022, subd. (a)(1).)

The case was tried to a jury during Spring 2013, at which time the prosecution presented evidence establishing the facts summarized above. Andino testified; Llanos did not. Andino testified that he, Llanos and Ortiz committed a "winning lottery ticket scam," and that the victim, Singh, had voluntarily gone along to all of the locations on November 9, 2011, because he thought that he would get a portion of the proceeds from the winning lottery ticket in exchange for the money and valuables that he gave to Andino and Ortiz. Andino said he called Llanos, who pretended to be a representative of the California Lottery. The call was placed on speaker phone. Llanos said Ortiz's ticket was one of three winning tickets and that the jackpot was $9 million. Llanos said he needed two photo identifications, a social security card, and proof of a bank account. According to Andino, Singh offered to provide the identification requested and was told he would give them part of the money as a gift. However, Andino told Singh he would not turn over the ticket because he could become the owner of the ticket. Andino said he needed a down payment on the ticket and that he would split the jackpot evenly with Singh and Ortiz. Singh used his phone to call to find out how much money he could get out of his bank and credit cards. Andino claimed the drive during which the stops were made was pleasant and that Singh was happy and talkative. Singh told Andino he needed a pill for his prostate and when Singh went to the store to buy it, Andino and Llanos left him.

---

[4]    All further undesignated statutory references are to the Penal Code.

The case was submitted to the jury with instructions on kidnapping for robbery and the lesser offense of grand theft by trick. The jury returned verdicts finding Andino and Llanos guilty of kidnapping for robbery; the firearm use and principal armed allegations were found to be not true. The trial court subsequently sentenced Andino and Llanos to the prescribed term of life with the possibility of parole.

Llanos and Andino filed timely notices of appeal.

## DISCUSSION

*Andino's Appeal*

### I.     Instructional Error

Andino contends his aggravated kidnapping conviction must be reversed because the trial court erred in crafting the accomplice testimony instructions. Specifically, Andino contends the trial court incorrectly instructed the jurors that the testimony he gave in his own defense required supporting evidence. We disagree.

#### A.     Forfeiture

Before considering this issue on the merits, we address the People's argument that Andino forfeited his instructional error claim. We agree with the People that Andino forfeited this claim.

##### 1.     The Trial Setting

During a conference on jury instructions, the prosecutor advised the trial court that part of CALCRIM No. 334, the standard accomplice testimony instruction, should be modified. Specifically, the prosecutor pointed to the following language in the instruction: "Any testimony of an accomplice that tends to incriminate the defendant should be viewed with caution." The prosecutor explained his concern that this language might lead the jurors to believe that they should view Andino's testimony in his own defense with caution. The prosecutor proffered that the standard accomplice testimony instruction should be modified to tell the jurors more distinctly that the general rules for judging credibility governed when they evaluated Andino's testimony as it applied to Andino. At the same time, the prosecutor said that the jurors should still be instructed with the standard accomplice testimony instruction insofar as Andino's testimony

8

concerned Llanos. That is, that Andino's testimony implicating Llanos in a crime needed to be corroborated and should be viewed with caution. When the trial court indicated that it was inclined to adopt the prosecutor's suggested modifications, Andino's counsel stated, "That's fine. Okay." A moment later, the trial court expressed concern that some of the instructions (not directly identified) as they related to "codefendants" could be confusing. The court invited all of the lawyers to look over the court's proposed instructions and "report back to me tomorrow morning to see if there's any contradictions in the language or any further directions need to be made."

The following morning, the trial court asked counsel if they had an opportunity to read and review the court's proposed instructions. Counsel for both Andino and Llanos answered in the affirmative. The court then asked if they had any objection to any of the instructions prepared by the court. Counsel for both Andino and Llanos indicated they did not.

At the close of trial, the trial court instructed the jury with the agreed upon and modified version of CALCRIM No. 301, as follows:

> "*Except for the testimony of Norberto Andino, which requires supporting evidence*, the testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." (Emphasis added.)

The trial court further instructed the jury on accomplice testimony with the agreed upon modified version of CALCRIM No. 334:

> "Before you may consider the testimony of Norberto Andino *as evidence against defendant Lucio Rios Llanos regarding the crimes of kidnapping to commit robbery or grand theft*, you must decide whether Norberto Andino was an accomplice to those crimes. A person is an accomplice if he or she is subject to prosecution for the identical crime charged against defendant Lucio Rios Llanos. *For purposes of this instruction only, whenever the term "defendant" is used it refers to Lucio Rios Llanos. . . .*" (Emphasis added.)

9

The trial court then continued with the standard accomplice instruction as it defines when a person is an "accomplice." The court then continued with its modified version of CALCRIM No. 334 as follows:

"If you decide that Norberto Andino was an accomplice, *then you may not convict defendant*[5] of kidnapping to commit robbery or grand theft based on his testimony alone. You may use the testimony of an accomplice to convict defendant only if:

*The accomplice's testimony is supported by other evidence that you believe*;

The supporting evidence is independent of the accomplice's testimony; and

That supporting evidence tends to connect the defendant to the commission of the crimes." (Emphasis added.)

The court then instructed with the standard jury instruction language stating that the "supporting evidence may be slight," but that it is "not enough if the supporting evidence merely show[ed] a crime was committed or the circumstances of its commission." And that the "supporting evidence must tend to connect the defendant to the commission of the crime." The court followed that instruction with the agreed upon modified version of CALCRIM NO. 334 as follows:

" . . . Any testimony of an accomplice that *tends to incriminate the defendant should be viewed with caution*.

"You may not, however, arbitrarily disregard it. You should give that testimony the weight you think it deserves after examining it with care and caution and in the light of all the other evidence.

---

5    "Defendant" here and elsewhere in the instruction meant Llanos under the opening part of the instruction.

"*In evaluating the testimony of Norberto Andino as it pertains to himself, apply the general rules of credibility.*" (Emphasis added.)

Shortly after beginning his closing argument, the prosecutor discussed the accomplice instructions as follows:

"Now, one thing I do want to address straight off the bat, the accomplice testimony instruction. That can be a little bit confusing. Let me explain how that would go. *You can't convict Mr. Llanos based on Mr. Andino's testimony unless you find Mr. Andino's testimony has been corroborated, legally corroborated. There is not that requirement when you consider Mr. Andino's testimony as to Mr. Andino. When you consider Mr. Andino's testimony as to Mr. Andino, you judge it by the same standards you would any other witness.*"[6] (Emphasis added.)

2. Analysis

"A party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language." (*People v. Lang* (1989) 49 Cal.3d 991, 1024.) A defendant's failure to request a clarifying or amplifying instruction at trial

---

[6] The accomplice testimony instructions were discussed again at the time of a joint motion for new trial by both defendants after the jury returned its verdicts. During those discussions, the trial court acknowledged that its instruction "regarding single witness testimony should have said, as to Mr. Llanos only, that an accomplice's testimony needed to be corroborated, but the testimony of Mr. Andino as to himself need not be corroborated . . . ." The court referred to an earlier discussion during the trial in which it decided that, rather than re-instruct the jury on that point, it would allow the prosecutor to clarify in his argument that "any ambiguity as to Mr. Andino's testimony as it affects himself, not Mr. Llanos." The court stated that such a resolution was not uncommon, and noted that it had often allowed an ambiguous instruction to be clarified in argument. The court concluded that, although its instruction was "inadequate," the prosecutor's explanation disabused the jury of any notion "that Mr. Andino needed corroborating testimony as to his testimony as to himself."

11

forfeits any argument on appeal that the instruction given was ambiguous or incomplete. (*People v. Cole* (2004) 33 Cal.4th 1158, 1211; *People v. Hart* (1999) 20 Cal.4th 546, 622.)

Here, the trial court expressed concern to the lawyers that the instructions as they related to codefendants might be confusing to the jurors and expressly requested that the lawyers take a special, overnight precaution to look over its proposed instructions and report any problems the following morning. The next morning, Andino's counsel stated openly that there were no problems. Further, counsel did not request that the court modify its proposed jury instructions in any manner. The absence of affirmative input forfeits Andino's claim of instructional error on appeal. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1211; *People v. Hart*, *supra*, 20 Cal.4th at p. 622.)

B.      The Merits of the Instructional Error Claim

Even were we to assume that Andino's instructional error claim is not forfeited, we find no error occurred. As a starting point, we find that the only part of the instructions which had any potential problem is the instruction with the modified version of CALCRIM No. 301 as follows: "*Except for the testimony of Norberto Andino, which requires supporting evidence*, the testimony of only one witness can prove any fact."

This modification was entirely appropriate in directing the jury to consider Andino's testimony in regard to convicting Llanos. Andino asserts, however, the modified CALCRIM No. 301 language used at Andino's trial was problematic because his testimony did not require supporting evidence for the jury to consider his testimony in his own defense. As we explain, however, we find no error in the jury instructions when they are considered as a whole.

In assessing a claim of instructional error or ambiguity, a reviewing court must consider the instructions as a whole to determine whether there is a reasonable likelihood the jurors were misled as to the controlling law. (See, e.g., *People v. Tate* (2010) 49 Cal.4th 635, 696.) Further, a reviewing court presumes that jurors are "capable of understanding and correlating jury instructions." (*People v. Martin* (1983) 150 Cal.App.3d 148, 158; and see also *People v. Holt* (1997) 15 Cal.4th 619, 677 (*Holt*)

12

[reviewing court must assume that jury understood and applied instructions as a whole].)[7] Finally, a reviewing court may also "consider the arguments of counsel in assessing the probable impact of instruction on the jury." (*People v. Young* (2005) 34 Cal.4th 1149, 1202.)

Examining the entire instructional charge, we find it is not reasonably likely that the jurors misapplied CALCRIM No. 301 by requiring supporting evidence before Andino's testimony, as it benefited his own defense theory, could be considered. The court instructed the jury in CALCRIM 334 that "*In evaluating the testimony of Norberto Andino as it pertains to himself, apply the general rules of credibility*." (Emphasis added.) It is clear to this court, and we presume it was clear to the jurors, that Andino's testimony could be used without the need for supporting evidence when evaluating Andino's testimony in his own defense theory of a grand theft. Regardless of any ambiguity in CALCRIM No. 301 at the outset of the court's instructions, the remainder of the instructions told the jurors to consider Andino's testimony as accomplice testimony only as it affected the charges against Llanos.

As stated by the Court of Appeal in an analogous situation involving a claim of instructional error related to the use of an accomplice's out-of-court statement: "We believe the jury would have understood the commonplace fact that evidence presented as part of the defense case could be used in favor of the defense." (*People v. Mackey* (2015) 233 Cal.App.4th 32, 109.) Here, when CALCRIM Nos. 301 and 334 are considered as a whole, we are satisfied that the jurors would have understood the challenged "supporting evidence" language in CALCRIM No. 301 to apply only to Andino's testimony to the extent they looked to use such testimony to find Llanos guilty of a crime. Stated in other words, the jury would have understood that the potentially suspect portion of CALCRIM No. 301 was limited to using testimony from Andino to incriminate Llanos, not to undermine Andino's defense that he committed only grand theft by trick.

---

[7]     In Andino's current case, the trial court prefatorily instructed the jury with CALCRIM No. 200 as follows: "Pay careful attention to all of these instructions and consider them together."

13

We also find that any potential ambiguity was resolved by the prosecutor's comments during his argument. As noted above, the prosecutor's explanation of the interplay between CALCRIM Nos. 301 and 334 removed any potential for doubt that the jurors may have had regarding the use of Andino's testimony; the prosecutor expressly told the jurors that they did not need to find supporting evidence before they could use Andino's testimony as to Andino's defense.

By telling the jurors: "You can't convict Mr. Llanos based on Mr. Andino's testimony unless you find Mr. Andino's testimony has been corroborated," the prosecutor made it clear that the corroboration requirement only applied to Andino's testimony to the extent that it incriminated Llanos. Further, by informing the jurors that Andino's testimony "as to Mr. Andino" had to be judged "by the same standards you would [judge] any other witness," the prosecutor clarified that Andino's testimony in support of his defense theory of a grand theft by trick was not subject to the corroboration requirement.

In light of all of the circumstances before us, we find no reasonable likelihood that the jury misconstrued the modified version of CALCRIM No. 301 to Andino's detriment. (See *People v. Jaspar* (2002) 98 Cal.App.4th 99, 111-112 [although part of an instruction was "potentially confusing," the potential for confusion "was dissipated" when the potentially confusing part was "read in conjunction with the entire instruction and the other instructions, and when combined with the arguments of counsel"]; see also *People v. Young*, *supra*, 34 Cal.4th at pp. 1202-1203 [no basis to find jury misinterpreted or was confused by an ambiguous instruction regarding applicability of second degree murder to some murder counts where prosecutor clarified in closing argument that second degree murder instruction applied to all murder counts].) There simply was no error here as there was no misleading instructional charge.

14

**II.    Ineffective Assistance of Counsel**

Andino had two counsel at the trial court level – one who represented him throughout trial (trial counsel), and Mark McKinniss, who represented him during a motion for new trial (new trial counsel). Andino contends both rendered ineffective assistance of counsel. We find none of his claims meritorious.

To prevail on a claim of ineffective assistance of counsel a defendant must establish two elements: (1) counsel's representation fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors or omissions, a determination more favorable to the defendant would have resulted. (See *Strickland v. Washington* (1984) 466 U.S. 668, 690, 694 (*Strickland*); and see, e.g., *Holt, supra,* 15 Cal.4th at p. 703.)

In our review on direct appeal, we presume counsel rendered adequate assistance and exercised reasonable professional judgment in making trial decisions. (*Holt, supra*, 15 Cal.4th at p. 703.) The record must demonstrate the lack of a rational tactical purpose for a challenged act or omission. (*People v. Williams* (1997) 16 Cal.4th 153, 215.) If the record fails to disclose why trial counsel acted or failed to act in the manner challenged, the ineffective assistance of counsel claim must be rejected unless counsel was asked for, and failed to provide, an explanation or there could be no plausible explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 426.) Claims of ineffective assistance of counsel are often more appropriately asserted and resolved by means of habeas corpus. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 267.)

A.    Instructional Error

Andino first claims his trial counsel was ineffective by failing to request further modifications to the jury instructions on accomplice testimony, as discussed in the immediately preceding discussion. Andino contends that in the event we find his instructional error claim is deemed forfeited, we must reverse his conviction because his trial counsel was ineffective for not objecting to the trial court's accomplice testimony instructions. We disagree because, as we have explained, we find no instructional error in the first instance.

15

Further, even assuming some deficient representation by Andino's trial counsel in failing to request further clarifying accomplice testimony instructions, we see no reasonable probability that, but for counsel's omission, the result of Andino's case would have been more favorable. The resolution of this issue folds back upon our discussion above. We find no basis in the trial record to support the possibility that the jury misinterpreted or was confused by the accomplice testimony instructions. We find this particularly true here, where the prosecutor expressly told the jurors that Andino's testimony as to Andino did not need to be corroborated, to judge his testimony as any other witness.

B. Violating the Duty of Loyalty

Andino next argues his new trial counsel violated a long-recognized duty on the part of an attorney not to make an argument that is against his or her client's interests (see, e.g., *People v. Feggans* (1967) 67 Cal.2d 444, 447), and, thus provided ineffective assistance of counsel. We are not persuaded.

A significant aspect of the written motion for new trial consisted of an argument to the trial court, requesting it to independently review the evidence pursuant to section 1181, subdivisions 6 and 8. Specifically, to reject the jury's decision to accept the credibility of Singh, who testified he was kidnapped by the use of fear, over the credibility of Andino, who claimed Singh voluntarily gave his money to Andino and purchased jewelry as a down payment on a fake winning lottery ticket. New trial counsel's motion urged the court to exercise its role as a "13th juror" and grant a new trial because the evidence was not sufficient to prove kidnapping for purpose of robbery. (See, e.g., *People v. Salgado* (2001) 88 Cal.App.4th 5, 9-10; and see also *People v. Hatch* (2000) 22 Cal.4th 260, 272 [when the trial court disagrees with the jury's resolution of conflicting evidence and concludes that a guilty verdict is against the weight of the evidence, a retrial is permissible].)

16

In the context of this argument, there were a series of statements undermining Andino's credibility, such as: "Clearly, Mr. Andino is a professional liar . . . ." The prosecution's opposition to the new trial motion noted these statements and argued that even Andino's own counsel acknowledged that he was not a credible person.

We find the statements made about Andino's credibility were the result of a tactical choice by new trial counsel. Reviewed in its entirety, and not focusing only on the discrete statements about Andino's credibility, the new trial motion in effect made this argument: "Even if one thinks Andino is a liar, his testimony about a lottery ticket scam must be viewed as the only version of events that makes any sense at all given all of the other trial evidence." The new trial motion accepted a "lack of credibility" jab so that a stronger counter-punch could be thrown. As the motion asked, why should a liar like Andino be believed? "Because [his testimony] is the only version that explains ALL the evidence." The ploy may have had a potential for risk, but we find it had a reasonable, tactical purpose.

We also reject Andino's claim because a review of the trial court's ruling, reasoning, and comments at the hearing on the new trial motion demonstrate to us, without any doubt, that the result of the motion would not have been any different had Andino's new trial counsel refrained from characterizing Andino as a "professional liar." The court's language at the hearing shows that it declined to reject the jury's verdict because it, too, believed the victim's testimony that he had acted out of fear of harm for himself and his family. The court did not deny Andino's new trial motion on the ground that new trial counsel acknowledged Andino lied, but instead because the court, as a 13th juror, believed the victim's trial testimony.

C.      Misunderstanding the Law

Andino contends his new trial counsel was ineffective because he misunderstood the law when arguing the jury verdict was inconsistent. We disagree.

In the new trial motion, counsel argued the jury erred in finding force or fear for robbery because it found the gun use allegations not true. Andino correctly notes that the actual existence of a gun was not required to prove force or fear. However, merely

17

showing that new trial counsel submitted a losing argument does not establish an ineffective assistance of counsel claim. The question is not whether Andino's new trial counsel presented a losing argument, but rather, whether counsel failed to make an available winning argument. The showing on appeal here does not establish that, but for counsel's performance, the result of Andino's new trial motion would have been different.[8]

D. The Victim's Cell Phone Records

Andino next contends his new trial counsel was ineffective because he raised a claim of error faulting the trial court's rulings on a discovery request for Singh's cell phone records rather than raising a claim that trial counsel was ineffective for not obtaining the discovery. We disagree.

Andino and Llanos filed a joint motion to compel discovery of the cell phone accounts of Singh and his family members. In it, trial counsel argued that the records might be relevant to impeach Singh and show he had used his cell phone on the day of the incident, in contradiction to his testimony at the preliminary hearing, where he said he did not have his cell phone with him. The motion was denied because trial counsel failed to make an evidentiary showing indicating Singh's testimony could be impeached. The court found that something more than defense counsel saying "my client says he saw Singh with a cell phone" was required before he would grant the motion. Andino's counsel represented that the defense lawyers were not going to allow their clients to take the stand and testify to lay a foundation for the discovery of Singh's cell phone records. The court confirmed with both defendants that they desired to remain silent.

During trial, Andino's counsel commented during opening statement that Andino would testify that Singh had used his cell phone on the day of the crimes. The prosecutor stated it now intended to introduce Singh's cell phone records when Andino took the

---

[8] Andino also faults new trial counsel's repeated statements that Andino was convicted of "kidnapping *and* robbery," whereas, in actuality, he was convicted of "kidnapping *for the purpose of* robbery." There was no prejudice as a result of these misstatements, so we reject the claim summarily.

stand and testified. Andino's counsel requested the records, and the court ordered the prosecution to produce Singh's cell phone records for the day of the crime.

At the start of the next court day, Llanos's counsel informed the court that the prosecutor had produced only a single piece of paper with three entries on it, not the phone records. The prosecutor indicated that the piece of paper was all T-Mobile provided, and that the prosecution had no phone records from November 6th to the 9th. The prosecutor stated that he had given one of the detectives the court order to turn over records for November 9, 2011, and the single piece of paper was e-mailed to the detective. At some point later that day, the prosecutor gave the court the entire file from the detective, which the court turned over to trial counsel. It included additional e-mails which indicated records were sent for 2012, instead of 2011, and that records reflecting which cell tower site had been used for any particular call were stored for only six months.

When Andino took the stand in his own defense, he testified that Singh had his cell phone with him on the day of the crime, and that he had seen Singh use it. The prosecutor did not attempt to introduce any of Singh's cell phone records. However, Singh testified in rebuttal that he did not have a cell phone with him that day. In addition, during the prosecution's case in chief, Balbir Singh, the victim's brother, testified that Singh had left his cell phone in Balbir's car on November 6, and that the phone had not been returned to Singh before the day of the crime.

New trial counsel argued in his motion that the trial court's rulings denying discovery of Singh's cell phone records were erroneous. When denying the motion for new trial on this ground, the court noted there were no declarations attached to the discovery requests. At a minimum, he said, a statement as to why the personal records of a witness are necessary, even if it is set forth only upon information and belief. The court indicated it was not responsible for filling in the gaps of missing information for the attorneys.

19

Andino argues "[he] knows of no case authority which conditions a grant of discovery on the defendant's waiver of his Fifth Amendment privilege . . . subjecting him to cross-examination at a pretrial motion." He cites *Brooks v. Tennessee* (1972) 406 U.S. 605, 611-612, to support the proposition that such a practice may be unconstitutional. Building on this Andino argues that his trial counsel performed below an objectively reasonable standard when he did not complain of the procedure imposed by the trial court and when he did not submit a declaration containing an offer of proof which could have been presented under seal. Andino also argues his new trial counsel was ineffective for not raising a claim that his trial counsel was ineffective.

For purposes of discussion, we will assume that trial counsel's moving papers and arguments were below an objective standard of reasonable performance because they were deficient to obtain discovery. Further, that new trial counsel's moving papers and arguments in the motion for new trial were also deficient, in not challenging trial counsel's performance. This being said, Andino's ineffective assistance of counsel claims fail because he has not shown a reasonable probability that, but for the deficient performance of his two lawyers in the lower court, the result of his case would have been different. The problem for Andino in pursuing a claim of ineffective assistance of counsel is that the record does not show what evidence would have been obtained in discovery. Thus, he cannot show that the evidence would have made a difference in his case. In short, Andino's claim of ineffective assistance of counsel fails to demonstrate prejudice, the second step of the test for ineffective assistance of counsel. (See *Strickland, supra*, 466 U.S. at p. 694.)

E.      Prosecutorial Discovery Abuse

Next, Andino argues his new trial counsel raised a meritless claim that the prosecutor failed to disclose evidence. His argument does not persuade us to reverse.

During trial, Andino's trial counsel argued that the prosecution failed to disclose evidence, but did not request any sanction despite the court's repeated inquiries about what sanction he considered appropriate. New trial counsel set forth this issue as

20

prosecutorial misconduct instead of ineffective assistance of trial counsel. On appeal, Andino asserts his new trial counsel was ineffective.

Andino's ineffective assistance of counsel claim fails because he has not shown a reasonable probability that, but for the deficient performance of his two lawyers in the lower court, the result of his case would have been different. Andino's claim of ineffective assistance of counsel again fails to demonstrate prejudice, the second step of the test for ineffective assistance of counsel. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

F.     The Translation Issue

Andino next contends his new trial counsel was ineffective because he raised a meritless claim that the trial court erred by excluding from evidence an alternate translation of the Spanish word "robo." Andino contends his new trial counsel should have argued the error was the result of his trial counsel's ineffectiveness. We disagree.

1. The Proceedings Below

During the prosecution's case-in-chief, Detective Hernandez testified that she participated in tape recorded interviews of Andino and Llanos after they were arrested in Florida. LASD Detective Mark Gittens, along with Detective Lorenz, also participated in the interviews. When Detective Hernandez testified about the Andino interview, she said that "large portions" of the interview were conducted in English, but at times, she spoke in Spanish to facilitate the questions and answers between Andino and Detective Gittens. Tapes of the interviews were not introduced at trial, apparently because parts were in Spanish. In lieu thereof, Detective Hernandez reviewed her copies of the interview transcripts to refresh her memory, and she then described what was said. Detective Hernandez testified that Andino never said anything about a "lottery scam" or any kind of trick. Throughout the interview Andino denied that he robbed or kidnapped anybody. However, in response to a question in English from Detective Lorenz about why Andino would travel to Los Angeles "to rob somebody," Andino answered in English: "I have family to take care of."

21

During cross-examination of Detective Hernandez, Andino's trial counsel asked the detective if she was a certified translator. The detective acknowledged she was not. Andino's trial counsel then began a line of questioning about whether there was a difference in Spanish when translating the words theft and robbery. A short exchange ensued as to whether the Spanish word "robo" had two meanings, namely, robbery and theft. Detective Hernandez answered she assumed there was a difference and that she "would use the word 'robo' for robbery." At this point, the trial court struck the questions and answer, noting that counsel was asking for a Spanish translation and there was nothing to confirm its accuracy. The court told the jury that if any of them spoke Spanish, they were to ignore the brief exchange.

At a sidebar conference, the court explained to Andino's trial counsel that if he was challenging a specific translation by the detective, then he needed to bring in a Spanish translator to interpret the detective's words. The court asked trial counsel if there was something in the transcript of Andino's interview that was inaccurate or if he was just on a "fishing expedition." Trial counsel advised that he listened to the audio, that he spoke a little bit of Spanish, and that he believed that the word for robbery may have been mistranslated. When the court asked for offer of proof, trial counsel responded that "robo" could mean "robbery" or "theft." The court ruled that if he wished to introduce this testimony, trial counsel needed his own translator who had listened to the tape and who could state that the translation was incorrect. When the court asked trial counsel if he was planning on engaging a Spanish language interpreter to look at the transcript, he responded that he was going to have one listen to the audio recording. The court ordered Detective Hernandez to remain available in case the issue developed further.

As noted, during cross-examination of Andino, the prosecutor introduced three excerpts from his post-arrest interview with Detective Hernandez, and LASD Detectives Gittens and Lorenz. The excerpts were on a tape recording played to the jury with an accompanying written transcript. The excerpts showed Andino speaking in English, including a short passage where he asked about the "Final Four" basketball game

22

between Kentucky and Kansas. The third excerpt, in English, included the following exchange:

> "Lorenz: Why, Why would somebody that seems like a nice guy, come all the way up to Los Angeles to rob somebody? With two other people? Staying at the Ramada Inn, and go out to Irvine, for most of the day. Hours, hours. From Irvine, out to uh, next day out to Thousand Oaks, Agoura Hills, Simi Valley, San Bruno, that's up by, that's up by San Francisco. Why, man, why? ¿Por que?
>
> "Andino: I have family to take care of.
>
> "Lorenz: Okay, makes sense. [¶] We all have family to take care of. . . ."

2.      Analysis

Andino claims his new trial counsel was ineffective for arguing the trial court erred in refusing to admit evidence that the translation of the Spanish word "robo" was incorrect, that a translator had to say so, not his defense attorney. Further, Andino correctly notes that the trial court did not foreclose further examination of the issue, but instead told his trial counsel what needed to be done. Andino argues that nothing prevented his trial counsel from questioning Andino during his direct examination how he understood the questions during his interview. In particular, asking whether he understood the Spanish word "robo" to mean robbery or theft, and to explain his response in terms of his understanding of the questions. Building on all of this, Andino argues that had his new trial counsel actually read the trial transcript he would have realized that any claim of judicial evidentiary error was, to quote Andino, an "absurdity," and that new trial counsel should have laid a claim of ineffective assistance of counsel at the feet of trial counsel.

We reject Andino's claim that his new trial counsel was ineffective for failing to assert a claim that his trial counsel was ineffective for this reason. First, the record does not affirmatively show that Andino's trial counsel acted below an objectively reasonable

23

standard of care. In addressing an ineffective assistance of counsel claim, we presume that counsel acted competently. (see, e.g., *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260.) On the record before us, we presume it is possible that trial counsel did, as he said he would, consult with a Spanish interpreter and was told "robo" meant "robbery." Because there could be a satisfactory explanation for counsel not pursuing the translation matter, we reject any claim of ineffectiveness associated with the matter. (See, e.g., *People v. Mendoza Tello*, *supra*, 15 Cal.4th at p. 266.) In this same vein, we note that the record does not show how many times, if any, that the Spanish word "robo" was used during Andino's post-arrest interview. As noted above, the interview itself was not introduced into evidence. Only three excerpts taken from the interview were introduced during trial, during cross-examination of Andino, and none of the excerpts showed the use of the Spanish word "robo."

Second, given that Andino's incriminating statement — to the effect that he "had family to take care of" — was made in English, in response to a question that was posed in English using the word "rob," we see no probability that the result of Andino's trial would have been more favorable if his trial counsel could have established that the Spanish word "robo" had a dual meaning of "robbery" and "theft." (*Strickland*, *supra*, 466 U.S. at p. 694.)

G.      The Existence of Video Cameras

During trial, LASD Detective Toy testified that  during her investigation, she took Singh to a number of locations where he said he went with Andino and Ortiz. She indicated she located video at some of the locations, but she was not asked specifically by any of the lawyers about whether there were video cameras at Bhindi Jewelers. Detective Toy turned over everything she had to LASD Detective Gittens when the case was transferred to the Major Crimes Bureau.

In new trial counsel's motion, he asserted there were "no less than 48" video cameras in Bhindi Jewelers. In the opposition to the motion for new trial, the prosecutor stated that there was nothing in the record to support the assertion that there were video cameras in Bhindi Jewelers.

24

Certainly new trial counsel's allegation that there were at least 48 video cameras in Bhindi Jewelers contradicted the prosecutor's pretrial representations that there was no video at Bhindi Jewelers. In addition, despite the fact that new trial counsel had time to verify his assertion, his bare claim about the existence of many video cameras had no evidentiary value because he failed to file a declaration indicating how he knew that information.

We are willing to accept Andino's argument that new trial counsel should have known that *Brady*[9] placed the burden on Andino to show that the evidence was both favorable to the defense and material on the issue of whether it was a theft or a kidnapping. (*In re Sassounian* (1995) 9 Cal.4th 535, 543; *People v. Clark* (2011) 52 Cal.4th 856, 980.) We also agree that one way to meet the burden on either basis was to request an evidentiary hearing wherein the prosecutor produced all investigators from the sheriff's department and the Major Crimes Division who had access to the video tapes to be questioned as to what happened to the video tapes, who viewed them, and what was on them. The problem with Andino's ineffective assistance of counsel claim on appeal is that there is no evidence of whether video tape from the Bhindi jewelers recorded Singh on the day of the crimes, and if so, what it showed.

The issue for an ineffectiveness claim on appeal is whether the result of Andino's new trial motion would have been different. We cannot evaluate this question on appeal because the record does not show whether there was video footage and, if it existed, what was on it. This said, we note that there is a more developed showing of the issue of video cameras in Andino's parallel motion for writ of habeas corpus. Apart from this, we reiterate that a showing of ineffective assistance of counsel is not demonstrated from the record on appeal.

---

[9]     *Brady v. Maryland* (1963) 373 U.S. 83.

H.      Corroborating Witness

Andino contends he is entitled to relief based on ineffective assistance of counsel because his trial counsel did not call a witness, Jawahar Vashi, and new trial counsel should have presented this argument in his motion. Vashi was the employee at Bhindi Jewelers who sold the Rolex watches to Singh on the day of the crime. During his cross-examination at the preliminary hearing, Vashi testified that Singh acted "normal," and that he "seemed like a regular customer making a regular purchase." The prosecution did not call Vashi at trial. Neither did the defense. We find no basis to reverse.

Andino's argument that his trial counsel could have had no objectively reasonable tactical reason for not calling Vashi to testify for the defense falters. We must presume counsel acted competently. (*Holt, supra*, 15 Cal.4th at p. 703.) The record on appeal sheds no light on why trial counsel decided not to call Vashi, and there are potentially satisfactory reasons for the decision. At the time of the preliminary hearing, nine months after the incident, Vashi indicated he had only a dim recollection of the sale to Singh. It is possible that by the time the case went to trial, another eight months later, Vashi had no recollection of Singh or his demeanor in the store. Alternatively, Vashi could have told trial counsel that he now recalled Singh had seemed afraid when he was in the store. Because there are potentially satisfactory reasons for trial counsel's failure to call Vashi, this ineffective assistance claim must be rejected on appeal. (*People v. Mendoza Tello, supra*, 15 Cal.4th at p. 266.)

Second, even assuming Vashi did testify that Singh seemed calm while buying the Rolex watches, we see no reasonable probability that the jury's verdict would have been different. The defense presented evidence that Singh was alone and smiling as he withdrew money from the Bank of America in Hacienda Heights, and argued that this video showed he was an eager, willing participant in the events. Further, the jury also knew that Singh went into Bhindi Jewelers alone, and was there for some time, which provided him with the opportunity to report that he was a victim of a crime. We are not persuaded that, if only a Bhindi Jewelers' employee had testified, the jury would have believed Andino's testimony about the lottery scam. (See *Strickland, supra*, 466 U.S. at

26

p. 694.) The trial record shows that the jury believed that Singh acted under the fear that there was another criminal actor camped outside Singh's home, ready to harm his family in the event he failed to cooperate fully with Andino and Ortiz.

I.     Pretrial Investigation

Andino's next claim is that trial counsel failed to investigate Andino's defense that he and Llanos were only involved in a lottery ticket scam. We disagree. The record on appeal does not show what further evidence may have been uncovered from a more thorough pretrial investigation.

J.     The Lesser Offense of Kidnapping

Andino also complains that new trial counsel should have contended in his motion that trial counsel was ineffective for failing to argue he was guilty of only simple kidnapping. Andino claims the jury could have found Singh initially agreed to accompany him, and only later decided to kidnap him. We are not persuaded.

It is the trial court's sua sponte duty to instruct on lesser included offenses when " 'the evidence raises a question as to whether all of the elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged.' " (*People v. Duncan* (1991) 53 Cal.3d 955, 969.) Given it is the trial court's sua sponte duty to instruct on lesser included instructions – without the request of counsel – it is difficult to put any blame on counsel for failing to request the instruction. Further, the evidence demonstrated one of two things – either Sing was kidnapped for a robbery, or he went along willingly with Andino to get his share of a fake lottery ticket. There being no evidence that a simple kidnapping occurred in the Chase Bank parking lot, or at any later time, the trial court had no duty to give an instruction on such a factual scenario. (*People v. Waidla* (2000) 22 Cal.4th 690, 735.) It follows that counsel cannot be found ineffective for requesting an instruction that would have been denied.

Further, a simple kidnapping theory would have been inconsistent with Andino's and Llanos's unified theory of the case that Singh willingly went with Andino and Ortiz the entire time. Andino's trial counsel could have reasonably determined that any marginal benefit from asserting a factually weak theory was outweighed by its potential

27

to undercut Andino's testimony and thereby undermine the defense claim that they were only guilty of theft by trick. Such a tactical decision would not support an ineffective assistance of counsel claim.

Even if the trial court had agreed to instruct the jury on simple kidnapping, and Andino's trial counsel argued the theory, we see no reasonable probability that the jury would have returned a verdict finding him guilty of simple kidnapping. As we have shown, there was no evidence of simple kidnapping theory.

Finally, new trial counsel cannot be faulted for not arguing this issue in his motion, because it was meritless. (*Strickland, supra*, 466 U.S. at p. 694.)

K.      Accomplice Instructions

Last, Andino asserts his trial counsel should have objected to the court's instruction that his testimony required corroboration. For the reasons discussed above, we disagree. The instructions, viewed in context of the entire trial, particularly the prosecutor's arguments clarifying the accomplice issue, are not erroneous. In addition, we see no possibility that an objection from Andino's counsel would have changed the result of his trial.

## IV.      Cumulative Errors and Omissions for Ineffective Assistance of Counsel

Andino contends his aggravated kidnapping conviction must be reversed because the cumulative effect of his counsel's errors and omissions resulted in ineffective assistance of counsel and a denial of due process. We disagree.

Because we have either rejected Andino's claims of errors on their merits or have found any assumed errors to be nonprejudicial, we come to the same conclusion with respect to the cumulative effect of his claimed errors. (*People v. Saap* (2003) 31 Cal.4th 240, 316.) Whether considered individually or for their cumulative effect, the errors claimed by Andino have not been shown — based on the record on appeal — to have affected the outcome of his trial. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1074; *People v. Boyette* (2002) 29 Cal.4th 381, 467-468.)

## I.  Instructional Error

Llanos contends his aggravated kidnapping conviction must be reversed because the trial court erred in instructing the jury on accomplice testimony.  We disagree.

### A.  Forfeiture

For the reasons we discussed above in addressing Andino's instructional error claim, we also find that Llanos forfeited this claim.  As we explained, the record shows that the trial court carefully posited the issue of the accomplice testimony instructions to both defense lawyers, and Llanos's trial counsel failed to raise any objection or to request any modifications to the court's proposed jury instructions.  Given the absence of any input by his trial counsel, we find Llanos forfeited his claim of instructional error on appeal.  (*People v. Cole*, *supra*, 33 Cal.4th at p. 1211; *People v. Hart*, *supra*, 20 Cal.4th at p. 622.)

### B.  The Merits

Here, Llanos contends there was error in the accomplice instructions on the same basis asserted by Andino.  The only twist is that Llanos contends that by misinstructing the jury about how to consider Llano's testimony, it also undermined his defense because the trial was a credibility contest between Sing and Andino.

We have demonstrated that there was no error in instructing the jury on accomplice instructions and that argument applies with equal weight to the claim Llanos raises.  Further, assuming without deciding that there was an instructional error, there was no prejudice.  Because Llanos's contention raises a constitutional due process claim, we apply the prejudice test articulated in *Chapman v. California* (1967) 386 U.S. 18, 24.  Under *Chapman*, we are satisfied beyond a reasonable doubt that the result as to Llanos would not have been any different had the trial court not given the accomplice testimony instruction.  We know for a certainty that the accomplice testimony instruction did not adversely affect Llanos's case because the jury, under properly given instructions regarding Andino (*ante*), rejected the joint defense offered by Llanos and Andino that the crime committed was only a grand theft.  In short, we know that the jury did not believe

that only a theft occurred as to Llanos because the jury rejected the same defense when considering the evidence about Andino.

## II.     Ineffective Assistance of Counsel

Llanos sets forth the same arguments for ineffective assistance of counsel as Andino does.  For the reasons explained above in addressing Andino's appeal, we likewise reject Llanos's contentions that he is entitled to relief because his new trial counsel was ineffective.

## III.     Cumulative Errors and Omissions Warranting Relief for Ineffective Assistance of Counsel

We similarly reject Llanos's claim that the cumulative effect of his lawyers' errors and omissions justify the remedy of a new or a second new trial motion hearing on properly asserted grounds.  Because we have either rejected Llanos' claims of errors on their merits or have found any assumed errors to be nonprejudicial, we come to the same conclusion with respect to the cumulative effect of his claimed errors.  (*People v. Saap*, *supra*, 31 Cal.4th 240, 316.)

## DISPOSITION

The judgments as to defendants and appellants Andino and Llanos are affirmed.


                                                    BIGELOW, P.J.

We concur:


            RUBIN, J.



            FLIER, J.


30